# THE A. S. ABELL COMPANY *v.* BARNES

[No. 311, September Term, 1969.]

*Decided May 7, 1970.*

58

The cause was argued before HAMMOND, C. J., and FINAN, SINGLEY, SMITH and DIGGES, JJ., and ROBERT C. MURPHY, Chief Judge of the Court of Special Appeals, and CHARLES E. ORTH, JR., Associate Judge of the Court of Special Appeals, specially assigned.

*Francis D. Murnaghan, Jr.*, with whom was *George Cochran Doub, Jr.*, on the brief, for appellant-cross appellee.

*Alan H. Murrell* and *William A. Hegarty* for appellee-cross appellant.

ORTH, J., delivered the opinion of the Court.

On 9 March 1964 the Supreme Court of the United States decided *New York Times Company v. Sullivan*, 376 U. S. 254. *New York Times* sired *Garrison v. State of Louisiana*, 379 U. S. 64 (1964) ; *Henry v. Collins*, 380 U. S. 356 (1965) ; *Linn v. United Plant Guard Wkrs. of Amer., Loc. 114*, 383 U. S. 53 (1966) ; *Rosenblatt v. Baer*, 383 U. S. 75 (1966) ; *Time, Inc. v. Hill*, 385 U. S.

374 (1967); *Curtis Publishing Co. v. Butts* and *The Associated Press v. Walker* reported together in 388 U. S. 130 (1967); *Beckley Newspapers Corp. v. Hanks,* 389 U. S. 81 (1967); *St. Amant v. Thompson,* 390 U. S. 727 (1968); and *Pickering v. Board of Education,* 391 U. S. 563 (1968). One of the things the prolific *New York Times* and its progeny did was to measure state law, both civil and criminal, with respect to libel, slander and privacy, by constitutional standards, impressing on it the first amendment guarantees of free speech and press.[1] They did so in such a way as to grant immunity from punishment by way of damages, imprisonment, fine or otherwise to publishers of statements concerning the official conduct of public officials and concerning matters of public interest related to public figures. The immunity is by privilege to the published statements. The privilege extends to true statements and false statements.[2] With respect to true statements the privilege is absolute;[3] with respect to false statements it is condi-

---

1. Of course it had long been firmly established that the freedoms secured by the first amendment to the Constitution of the United States against abridgment by the United States are similarly secured to all persons by the fourteenth amendment against abridgment by a state. See *Stromberg v. State of California,* 283 U. S. 359, 368-369 (1931). But defamation had generally been considered to be outside the scope of the first amendment. See, for example, *Beauharnais v. State of Illinois,* 343 U. S. 250 (1952). This appeared to be accepted even by advocates of the "absolutist" interpretation of the amendment. See Meiklejohn, *The First Amendment is an Absolute,* 1961 Sup. Ct. Rev. 245, 258. However, the question of measuring the common law of defamation by constitutional standards had arisen in connection with the absolute privilege of high-ranking government officials. See *Barr v. Matteo,* 360 U. S. 564 (1959); *Spalding v. Vilas,* 161 U. S. 483 (1896). And in *Schenectady Union Pub. Co. v. Sweeney,* 316 U. S. 642 (1942) the Court was evenly divided on a question of libel to a public official.

2. "Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." *St. Amant v. Thompson, supra,* at 732.

3. The *New York Times* rule "absolutely prohibits punishment of truthful criticism." *Garrison v. Louisiana, supra,* at 78. "Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned." Id. at 74.

tional. The privilege is removed only from those false statements which are made with "actual malice." With regard to libel we consider the rule to be:

The constitutional guarantees prohibit a public official from recovering damages for a defamatory falsehood relating to his official conduct or a public figure from recovering damages for a defamatory falsehood relating to a matter of public interest unless he proves that the statement was made with actual malice—that is with knowledge that it was false or with reckless disregard of whether it was false or not.

Our statement of the rule requires explanation and elaboration. It requires explanation as to why we think the reckless-disregard-of-truth standard is applicable equally with respect to public officials and public figures. It requires elaboration as to the meaning of terms used in stating it—"public official", "public figure" and "reckless disregard."

*New York Times,*[4] holding that "The Constitution delimits a state's power to award damages for libel actions brought by public officials against critics of their official conduct",[5] at 283, enunciated a rule applicable to such actions, at 279-280:

> "The constitutional guarantees require, we
> think, a federal rule that prohibits a public of-

---

4. *New York Times* was characterized by one commentator as "a decision in which past doctrine intersects present events in so complex a way as to be the despair of the commentator, not only because its portent is almost beyond prediction, but also because it opens so many avenues for inquiry." Kalven, *The New York Times Case: A Note on the "Central Meaning of the First Amendment"*, 1964 Sup. Ct. Rev. 191. From our consideration of opinions in other jurisdictions, we believe that it, and the progeny it sired, proved to be the despair also of trial courts and appellate courts.

5. In so holding it rejected the argument that "The Fourteenth Amendment is directed against State action and not private action." That proposition has no application when a state court applies a state rule of law which it is claimed imposes invalid restrictions on constitutional freedom of speech and press. "It matters not that that law has been applied in a civil action and that is common law only, though supplemented by statute. * * * The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised." At 265.

ficial from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not."

Although the rule by its terms was limited to "public officials", it seemed inevitable that the opinion would serve as a basis for expansion so as to affect those other than "public officials." This was realized in *Butts* and *Walker,* in which the ambit of constitutional concern was extended to "public figures", but it was done in such a way as to cast doubt on the standard to be applied to "public figures". The judgments of the Court, affirming the judgment in favor of Butts and reversing the judgment in favor of Walker, were announced by Mr. Justice Harlan who delivered an opinion in which Justices Clark, Stewart and Fortas joined. The Chief Justice delivered an opinion concurring in the results of both cases. Each of Mr. Justice Black, with whom Mr. Justice Douglas joined, and Mr. Justice Brennan, with whom Mr. Justice White joined, delivered an opinion concurring in the results of *Walker* and dissenting in *Butts*. The Harlan opinion noted that the two cases were brought to the Court "to consider the impact of [*New York Times*] on libel actions instituted by persons who are not public officials, but who are 'public figures' and involved in issues in which the public has a justified and important interest." At 134. All the members of the Court were in agreement that the basic considerations underlying the First Amendment required that some limitations be placed on the application of state libel laws to "public figures" as well as "public officials." The Harlan opinion stated a rule, at 155:

"We consider and would hold that a 'public figure' who is not a public official may also recover damages for a defamatory falsehood whose substance makes substantial danger to

> reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers."

Mr. Chief Justice Warren expressly rejected this test, adhering "to the *New York Times* standard in the case of 'public figures' as well as 'public officials.' " Id. at 164. Justices Brennan and White joined the Chief Justice in this. Id. at 172. Justices Black and Douglas did not adopt either standard. They thought it was time for the Court to abandon *New York Times* and adopt the rule to the effect that the First Amendment was intended to leave the press free from harassment of libel judgments. Id. at 172. Thus the opinions did not announce a standard under which limitations were placed on the application of state libel laws as to "public figures" that had support of a majority of the Court. In these circumstances we are constrained to apply the *New York Times* standard with respect to public officials equally with respect to public figures. We are not persuaded that the critic of a public figure should be afforded less protection, *if that is what the Harlan rule does*, than the critic of a public official. We point out the subtle difference between the public figure and the public official found by Chief Justice Warren which moves in the direction of giving more protection, if there must be a distinction, to the critic of the public figure rather than to the critic of the public official. He said in his opinion in *Butts*, at 164, "The fact that [public figures] are not amenable to the restraints of the political process only underscores the legitimate and substantial nature of the interest [in the conduct of such persons], since it means that public opinion may be the only instrument by which society can attempt to influence their conduct." And we point out that in *Hill* the actual malice standard was afforded to the publisher of an article which invaded the privacy of a private individual who was only invol-

untarily newsworthy. We make one more observation. It would seem that the distinction between proof establishing *highly unreasonable* conduct constituting an *extreme departure* from the standards of investigation and reporting ordinarily adhered to by responsible publishers and proof establishing reckless disregard for truth or falsity is so fine, if indeed there be a real distinction at all, as not to justify a further clouding of law of defamation by the adoption of the separate standard.

In elaboration we first consider when a person is to be deemed a "public official" or "public figure." *New York Times*, as to "public official", expressly begged the question. "We have no occasion here to determine how far down into the lower ranks of government employees the 'public official' designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not be included." 376 U. S., note 23, at 283. Although not defining "public official", the Court indicated, by referring to "categories of persons who would or would not be included", that the designation "public official" was not limited to "government employees." In *Rosenblatt* the Court observed that the question whether the respondent was a "public official" under *New York Times* was squarely presented. It first rejected the suggestion that whether or not a person is a "public official" should be answered by reference to state-law standards. "States have developed definitions of 'public official' for local administrative purposes, not the purposes of a national constitutional protection." At 84. But it found that no precise lines had to be drawn for the purposes of its decision. Asserting that the motivating force for the *New York Times* decision was twofold: (1) a strong interest in debate on public issues, and (2) a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues, it said, "Criticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of

government itself be penalized. It is clear, therefore, that the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of government affairs." At 85. The Court announced a test, at 86:

> "Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, both elements we identified in *New York Times* are present and the *New York Times* malice standards apply."

Mr. Justice Douglas suggested in his concurring opinion that this test might apply to a night watchman accused of stealing state secrets. The majority referred to this in a footnote, note 13, at 86, and answered:

> "But a conclusion that the *New York Times* malice standards apply could not be reached merely because a statement defamatory of some person in government employ catches the public's interest; that conclusion would virtually disregard society's interest in protecting reputation. The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy."

*Butts* and *Walker,* as we have noted, was concerned with "public figures". The Harlan opinion did not define "public figure". It did state, at 147-148:

> "From the point of view of deciding whether a constitutional interest of free speech and

press is properly involved in the resolution of a libel question a rational distinction 'cannot be founded on the assumption that criticism of private citizens who seek to lead in the determination of * * * policy will be less important to the public interest than will criticism of government officials.' Pauling v. Globe-Democrat Publishing Co., 8 Cir. 362 F. 2d 188, 196."

The Chief Justice in his opinion found no material distinction between "public figures" and public officials". He said, at 163-164:

"To me, differentiation between 'public figures' and 'public officials' and adoption of separate standards of proof for each have no basis in law, logic, or First Amendment policy. Increasingly in this country, the distinctions between governmental and private sectors are blurred. Since the depression of the 1930's and World War II there has been a rapid fusion of economic and political power, a merging of science, industry, and government, and a high degree of interaction between the intellectual, governmental, and business worlds. Depression, war, international tensions, national and international markets, and the surging growth of science and technology have precipitated national and international problems that demand national and international solutions. While these trends and events have occasioned a consolidation of governmental power, power has also become much more organized in what we have commonly considered to be the private sector. In many situations, policy determinations which traditionally were channeled through formal political institutions are now originated and implemented through a complex array of boards, committees, commissions, corporations, and associations, some only loosely connected with the

Government. This blending of positions and power has also occurred in the case of individuals so that many who do not hold public office at the moment are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large. Viewed in this context, then, it is plain that although they are not subject to the restraints of the political process, 'public figures,' like 'public officials,' often play an influential role in ordering society. And surely as a class these 'public figures' have as ready access as 'public officials' to mass media of communication, both to influence policy and to counter criticism of their views and activities. Our citizenry has a legitimate and substantial interest in the conduct of such persons, and freedom of the press to engage in uninhibited debate about their involvement in public issues and events is as crucial as it is in the case of 'public officials.' The fact that they are not amenable to the restraints of the political process only underscores the legitimate and substantial nature of the interest, since it means that public opinion may be the only instrument by which society can attempt to influence their conduct."

There was no debate among the Court as to whether Butts and Walker were public figures. Seven of the members who deemed it necessary to pass on the question agreed that each was a public figure for First Amendment purposes. Walker was a retired United States general who could be fairly deemed to be a man of some political prominence. Butts was a nationally known football coach, then athletic director at a state university but privately paid. The Harlan opinion recognized that none of the particular considerations involved in *New York Times* was present in the two cases before it. The

actions could not be analogized to prosecutions for seditious libel. Neither Butts nor Walker had any position in government which would permit a recovery by him to be viewed as a vindication of governmental policy. Neither was entitled to a special privilege protecting his utterances against accountability in libel. But both commanded a substantial amount of independent public interest at the time of the publications and both would have been labeled "public figures" under ordinary tort rules. The opinion reasoned that Butts may have attained his status of a public figure by position alone and Walker by his purposeful activity amounting to a thrusting of his personality into the "vortex" of an important public controversy—the enrollment of James Meredith as a student in the University of Mississippi. The Chief Justice, noting that both cases involved public figures, observed with respect to Walker: "Under any reasoning, General Walker was a public man in whose public conduct society and the press had a legitimate and substantial interest."

We gather from the whole of *New York Times, Rosenblatt* and *Butts* and *Walker* that the public official designation applies at the very least to those government employees who have, or appear to have, substantial responsibility for or control over the conduct of government affairs. This would be so when his position in government has such apparent importance that the public has an independent interest in the qualification and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees. But this public interest in the person must be apart from such interest as may be occasioned by the charges in controversy. While a person who is a public official is obviously a public figure, a person may be a public figure without being a public official. A person, not a public official, may be a public figure by position alone, as was Butts, or he may become a public figure by purposeful activity amounting to a thrusting of his personality into the vortex of an important public

controversy as did Walker, or by seeking to lead in the determination of policy, or, because, by any reasoning, he is a public man in whose public conduct society and the press have a legitimate and substantial interest. In sum, for first amendment purposes, whether a person is a public figure, *vel non*, depends, within the guidelines set out, upon the facts and circumstances of the particular case.

We observe in passing that it is difficult for us to reconcile *Hill* with *Butts* and *Walker*. Decided about a year after *Rosenblatt* and five months before *Butts* and *Walker*, *Hill* applied the actual malice standard of *New York Times* to a statutory invasion of privacy action where false statements were made concerning a private person who was involuntarily newsworthy. The verdict in favor of Hill was upset five to four. Mr. Justice Brennan delivered the opinion of the Court and four other justices delivered opinions. The Brennan opinion stated that there was no doubt that the subject of the publication, the opening of a new play linked to an actual incident, was a matter of public interest. Thus it was "newsworthy" and being newsworthy was within the sphere in which state-law remedies for aggrieved individuals are subject to judicial review under the first amendment. Was Hill a "public figure" because by no choice of his own he was a part of the actual incident to which the play was linked? The opinion did not say. It appeared to be the thesis of the opinion that "newsworthiness" defined the ambit of judicial concern rather than the status of the person aggrieved. But in *Butts* and *Walker*, neither the Harlan opinion nor the Warren opinion, in both of which the ambit issue was confronted again, called upon *Hill* but went back to *New York Times* to extend by analogy the basic protection set out in *New York Times*. And in *Hill*, the Court did not openly invoke *New York Times*. Are we to conclude, one commentator asks, that there are at present "two ambits of constitutionally protected speech, one appropriate only for false statements about individuals treated as privacy actions, the other

reserved for false statements about individuals treated as libel actions." [6] We consider, until the Supreme Court indicates otherwise, that it saw *Hill* and *Butts* and *Walker* as presenting problems it wishes to keep separate.[7] We observe that in the Harlan opinion in *Butts* and *Walker* it was carefully pointed out: "Nothing in this opinion is meant to affect the holdings in *New York Times* and its progeny, including our recent decision in Time, Inc. v. Hill." This statement was elaborated by a footnote, note 19 at p. 155: "Nor does anything we have said touch, in any way, libel or other tort actions not involving public figures [which we take to refer to the ambit of libel under New York Times as expanded by analogy] or matters of public interest [which we take to refer to the ambit of privacy under *Hill*]."

Next, in elaboration, we consider the reckless-disregard-of-truth standard. It is not the same as the reasonable-belief standard. "The test which we laid down in New York Times is not keyed to ordinary care; defeasance of the privilege is conditioned, not on mere negligence, but on reckless disregard for the truth." *Garrison* at 79. It is when statements are "made with the high degree of awareness of their probable falsity demanded by *New York Times*", id. at 74, that they are made with reckless disregard for their truth. Or as was said in *St. Amant* at 731:

"[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact

6. *Kalven, The Reasonable Man and the First Amendment: Hill, Butts,* and *Walker,* 1967 Sup. Ct. Rev. 267, 280-286. We have drawn in large measure on this excellent article in our discussion herein of *New York Times* and its progeny.

7. We note that in *Hill* some of the published matters were claimed to be false. Thus it involved a comparatively new species of invasion of privacy—false light privacy. See Prosser, *Privacy,* 48 Cal. L. Rev. 383 (1960). Traditionally, invasions of privacy involved statements that were true, in distinction to defamation where the statements were alleged to be false.

entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."

But the Court warned, at 732:

"The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."

As to the degree of proof to show actual malice, it must be of "the convincing clarity which the constitutional standard demands", unassisted by presumptions based on falsity. *New York Times* at 285-286. And see *Beckley Newspapers Corp.* at 83.

We turn now to the case before us. The A. S. Abell Company (appellant) [8] was shown to have published a statement concerning Elizabeth C. Barnes (appellee),[9] which falsely [10] imputed to her the commission of a crime subjecting her to prosecution and punishment,[11] thus

8. And cross-appellee and defendant below.
9. And cross-appellant and plaintiff below.
10. There was no plea of truth by way of justification, Maryland Rule 342 c 2 (h).
11. The failure to file reports required of her by law as a candidate for the position of delegate to the Constitutional Conven-

constituting a libel to her actionable *per se*. See *American Stores Co. v. Byrd*, 229 Md. 5, 13, citing *Dorsey v. Whipps*, 8 Gill 457, 462 and *Haines v. Campbell*, 74 Md. 158. The case was tried before a jury in the Baltimore City Court. At the close of all the evidence appellant moved for a directed verdict [12] and appellee moved for a directed verdict in her favor on the issue of liability. The lower court denied appellant's motion and granted appellee's motion, permitting the case to go to the jury on the question of damages. The jury awarded appellee $7500 for compensatory damages and made no award for punitive damages.

We have recognized an obligation, when the question is whether publications are obscene and thus without the protection of the first amendment, to make an independent constitutional judgment on the facts. *Sanza v. Md. Board of Censors*, 245 Md. 319, 330. We have the same obligation when the question is the effect of the first amendment on libelous publications, since the question is one of alleged trespass across "the line between speech unconditionally guaranteed and speech which may legitimately be regulated." *Speiser v. Randall*, 357 U. S. 513, 525. "In cases where that line must be drawn, the rule is that we 'examine for ourselves the statements in issue and the circumstances under which they were made to see * * * whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.' *Pennekamp v. Florida*, 328 U. S. 331, 335, 66 S. Ct. 1029, 1031, 90 L. Ed. 1295; see also *One, Inc. v. Olesen*, 355 U. S. 371, 78 S. Ct. 364, 2 L. Ed. 2d 352; *Sunshine Book Co. v. Summerfield*, 355 U. S. 372, 78 S.

---

tion. See the Corrupt Practices Act (Acts 1957, ch. 739) codified as Code, Art. 33, §§ 211-233. It was repealed by Acts 1967, ch. 392 which enacted new provisions. They were in turn repealed by Acts 1968, ch. 613 which enacted new provisions now codified under the subtitle "Fair Election Practices" as Art. 33, §§ 26-1 to 26-20.

12. Appellant moved for a directed verdict at the close of the evidence offered by appellee. It was denied. Appellant thereafter offered evidence and in so doing withdrew the motion. Rule 552 b.

Ct. 365, 2 L. Ed. 2d 352. We must 'make an independent examination of the whole record,' Edwards v. South Carolina, 372 U. S. 229, 235, 83 S. Ct. 680, 683, 9 L. Ed. 2d 697, so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." *New York Times,* at 285. See *Bachellar et al. v. State of Maryland,* 397 U. S. 564, 7 Cr. L. 3051, decided 20 April 1970.

There was evidence, adduced through the testimony of appellee, that she had received the degree of Bachelor of Arts, cum laude, from Bryn Mawr College, and the degree of Bachelor of Laws, cum laude, from the University of Maryland. She was admitted to the practice of law in courts of this State and the federal courts in 1936. Shortly after her graduation and before her marriage, she assisted in research for the Restatement of Trusts of the American Law Institute, being so engaged for about a year and a half. It was elicited that while attending law school she "was very much interested in the study of constitutional law, and the reason for that was because my father had had many interesting cases as a Judge in the Federal Courts and discussed them with us at length at home, and then, of course, my husband has always been interested in it. So that I have, over a period of quite a number of years, I would say at least thirty years, been particularly interested in the study of constitutional law, and I have had occasion occasionally to write an article or two about it." When she became aware that there was to be a Constitutional Convention to consider a new constitution for Maryland, "I became vitally interested in that, because I felt I had some knowledge of the subject, and when the then Governor Agnew asked women and men who had experience in that field, or as ordinary citizens to take part in the Constitutional Convention, I felt it was my duty to run, to be a candidate for the Constitutional Convention." She became a candidate. "So that when some of my friends who knew my interest suggested to me that I would be a good candidate, I felt doubly sure that that was the thing for me

to do." She filed with the Board of Election Supervisors and designated a Treasurer. There was formed a "Citizens Committee for the Election of Elizabeth C. Barnes as a Delegate to the Maryland Constitutional Convention", with Bernard J. Flynn as chairman to promote her election. "Mr. Flynn used to be District Attorney under my father, Judge Chesnut, I remember in the Federal Court. He was a very distinguished lawyer and very much admired by everyone." A treasurer for the committee, the same person who served as Treasurer for appellee individually, was properly designated. The Treasurer for appellee individually received funds as election contributions from members of the public and a report of receipts and disbursements was filed as required. On cross-examination appellee said that she recognized the Constitutional Convention as a matter of considerable public importance, that she considered the matter of who should serve in the convention a matter of great public concern and for that reason she finally determined to submit herself as a candidate. She identified a letter sent out before the election over the signature of Mr. Flynn as Chairman of the Citizens' Committee. "Our committee decided that we would like to give Elizabeth C. Barnes some support. So we decided to send out a letter to our people whom we considered might be interested in voting for me, and we asked for subscriptions to our campaign to those who would be glad to support us. It set out my services, stated that I held a law degree as a member of the Bar, both Federal and State, and that I was active in patriotic organizations, and worked in Civil Defense, and asked those who would like to join in support." She did not know to how many people it was mailed. The letters were either printed or mimeographed. The salutation on the letter was "Dear Fellow Citizens." It stated that appellee, "known for her life long service to the community of the 5th Legislative District, has filed for election to the Constitutional Convention." It continued:

"Certain changes in the basic structure of the

Maryland Constitution are being proposed. Are you aware of what these changes involve and how they will affect you and your family in the future? If you are concerned in preserving the freedoms guaranteed by our present State Constitution, we urge you to vote for Elizabeth C. Barnes to represent you in the Constitutional Convention.

Elizabeth C. Barnes is determined to preserve in the new Constitution the basic system of checks and balances so necessary for maintenance for our people's freedom. She will support efforts to eliminate obsolete Constitutional provisions but will vote to retain basic Constitutional freedoms.

Well qualified to represent our district, Elizabeth C. Barnes holds a law degree from the University of Maryland School of Law where she studied Constitutional Law and graduated cum laude. A member of the Maryland and Federal Bars, Mrs. Barnes was awarded a Presidential citation for her work with the Civilian Mobilization Corps during World War II. She is active in numerous civic and patriotic organizations and helped organize the Schenley Road Community Center to alleviate juvenile delinquency in one of the important sections of our district. For many years she served as Deputy District Coordinator for the Northern District for the Civil Defense Organization of Baltimore City.

Join us in support of Elizabeth C. Barnes, VOTE for her on JUNE 13th and ask your friends to do the same. Any contributions you can make to insure our Candidates election will be greatly appreciated. Please send contributions to Phyllis M. Chait, Treasurer, 4546 North Charles Street, Baltimore, Maryland, 21210."

The letter was proffered by appellant and received in evi-

dence. Appellee was not elected a delegate to the Convention.

On these facts it is our independent constitutional judgment that appellee was not a public official but was a public figure. She held no elective office; she was not a government employee; she had no position in government; thus she was not a public official. However we find that she was a public figure whether it be considered that she became such by her position as candidate for election as delegate to the Constitutional Convention; or by the purposeful activity on her part amounting to a thrusting of her personality into the vortex of an important public controversy; or by seeking to lead in the determination of policy in an important public matter; or because simply by her candidacy and campaigning she became a public person in whose conduct society and the press had a legitimate and substantial interest. Having so attained such status, she would not lose it in the short lapse of time between the election and the publication of the defamatory article. The statements published were obviously related to her as a public figure and were matters of public interest. Within the frame of reference of the false statements she was a public figure.

Because appellee was a public figure, appellant stood protected by the shield of privilege provided by the first amendment. This shield could only be removed by appellee showing with convincing clarity that appellant published the false statement with actual malice. But the shield was not so removed; it was stripped from appellant by the lower court without regard to the constitutional guarantees by the grant of appellee's motion for a directed verdict in her favor on the issue of liability. There was squarely before the lower court by the pleadings,[13] by argument of counsel during trial and by the granted motion itself,[14] that appellant was relying on the

13. Appellant pleaded the general issue and the constitutional guarantees of free speech and press, alleging appellee was a public figure and denying that the published statements were a calculated falsehood.

14. One of the stated grounds for the motion was that appellant

constitutional guarantees of free speech and press. Appellant's counsel made clear to the court that the defense was the immunity afforded appellant under *New York Times* and its progeny. It was the duty of the court in the circumstances to determine in the first instance whether the proof showed appellee to be a public official or a public figure. *Rosenblatt* at 88.[15] It did not do so. Rather it found that because the statements were libelous *per se* appellant was without the ambit of constitutional concern and, implicitly, that it was not material whether or not appellee was a public official or a public figure or whether or not the false statements were made with actual malice. It said, in denying the motion:

> "We don't consider that the Federal Cases that we have read, that there is a constitutional question here involved, because the per se, the per se involves the accusation of criminal acts. It's a statement of fact, which it turns out, was not true. And I think it goes beyond the rulings of the Supreme Court in these cases."

This was patently incorrect. "The power to create presumptions is not a means of escape from constitutional restrictions." *Bailey v. Alabama,* 219 U. S. 219, 239, as quoted in *New York Times,* at 284, which continues, quoting with approval *Lawrence v. Fox,* 357 Mich. 134, 146, N.W.2d 719, 725 (1959), "[t]he showing of malice required for the forfeiture of the privilege is not presumed but is a matter of proof by the plaintiff * * *." We hold that the grant of appellee's motion was error requiring reversal.[16]

---

had produced no evidence sufficient to prove that the contents of the publication were privileged.

15. *Rosenblatt* remarks, note 15 at 88: "Such a course will both lessen the possibility that a jury will use the cloak of a general verdict to punish unpopular ideas or speakers, and assure an appellate court the record and findings required for review of constitutional decisions."

16. Appellee concedes this in her brief, stating, "If there is such legally sufficient evidence [that she was a public official or a public figure], then the judgment should be reversed * * *."

We also find error requiring reversal in the denial of appellant's motion for a directed verdict made at the close of all the evidence. Appellee presented her case on the theory that the false statements were actionable *per se*.[17] But it was appellee's burden, once the evidence adduced by her established that she was a public figure, to prove with "convincing clarity" that the statements were made with actual malice. We cannot say, exercising our independent constitutional judgment on the facts, that the evidence she offered, concerned primarily as it was to proof of publication, the content of the publication, and that the statements in it were false, was sufficient to permit the conclusion that appellant knew the statements were false or in fact that it entertained serious doubts as to the truth of the publication. The author of the article published, a reporter employed by appellant, testified. He described the procedure he followed by which he ascertained to his satisfaction that appellee had not filed the report required. Two days after the election, he had gone with a colleague to the office of the Clerk of the Circuit Court of Baltimore City where the candidates' financial reports were to be filed. Together they examined the file drawers which contained papers filed by 344 candidates and committees. Since they had been told that a candidate's financial report would be interleaved with the paper designating the candidate's treasurer, the reporters removed from the file box only those bundles which contained no financial statement, and made a list of the names of the candidates. The reporters removed the file marked "Phyllis M. Chait Treasurer for Citizens Committee for Election of Elizabeth C. Barnes" inadvertently assuming it to be the file for Mrs. Barnes' Treasurer. Finding no financial report, they placed Mrs. Barnes' name on the list of candidates who had failed to file financial reports. In fact, interleaved with the designation of Mrs. Barnes' own treasurer (who was also Mrs. Chait)

17. At the close of evidence offered by her the court observed: "The entire theory of your case is per se." Appellee's counsel replied: "That is our position."

was the required financial report, which was overlooked, since under the procedure followed by the reporters, only the bundles containing no financial reports were removed from the files. In this fashion, there was compiled a list of the names of 86 candidates who had failed to file the required financial reports. Only in Mrs. Barnes' case was there an error.

There is no evidence to support a conclusion that he *knew* the statement that appellee had not filed the report was false. And if it be assumed that his investigation was not thorough, that he was negligent in the conduct of it, and that a reasonably prudent man would have taken other steps before making the statement, none of this would be sufficient to show that appellant published the statements with the high degree of awareness of their probable falsity demanded by the test. Reckless conduct is not measured by whether a reasonably prudent man would have published or would have investigated before publishing. See *Beckley Newspapers Corp.* at 84-85. The evidence here showed that appellant did not simply fabricate the story, or that it was the product of appellant's imagination, or that it was based wholly on unverified information anonymously received or that the statements were so inherently improbable that only a reckless man would have put them in circulation. Nor was the evidence sufficient to establish that there were obvious reasons to doubt the veracity of the reporter or the accuracy of his reports. In her brief appellee points to the contents of the article and the manner in which it was presented, that the reporter failed to produce notes of his investigation or the original article and the inadequacy of the investigation as sufficient to permit a finding of actual malice. We have noted that the inadequacy of the investigation was not sufficient to show actual malice. And we cannot say that the content of the publication and the manner in which it was presented were sufficient to support a finding under the required test that appellant knew the statements were false or made them with reckless disregard of whether they were false or not.

Nor do we think, under the circumstances shown, that actual malice can be inferred from the failure of the reporter to produce his notes or the original of the article. In short, we find that the evidence, in law, was not sufficient to permit the conclusion that appellant published the statements with actual malice—that is, either that he knew they were false or entertained serious doubts as to the truth of his publication. The evidence was not of the convincing clarity which the constitutional standard demands.[18] Therefore, the lower court committed reversible error in denying appellant's motion for a directed verdict made at the close of all the evidence.

Appellee urges that in the event the judgment is reversed, the case should be remanded "for a new trial and the submission of the case to the jury upon the issue of actual malice as federally defined if the jury should find the Appellee to be a 'public official' or that the investigation by the publisher was so inadequate as to

18. During argument out of the presence of the jury at the close of all the evidence, at which time there were pending before the court appellant's motion for a directed verdict and appellee's motion for a directed verdict in her favor as to liability, appellee's counsel discussed the evidence as to malice which had been adduced. The discussion was apparently on the question of punitive damages and was provoked by the indication of the court that it felt that there was no evidence of actual malice. Appellee's counsel said:

"The proof of actual malice, it would seem to me in all candor, to be somewhat weak. However, I feel that there is some element of that in there, and that is in what seems to me to be peculiar news treatment of the plaintiff. Number one, that she is the only one in the article whose spouse was mentioned. Number two, the placement within the article of her name immediately above the subheading, regarded as criminal. Number three, the fact, although the reporter says he did not know that she was an attorney, that her name was coupled with two other men and singled out for treatment differently than accorded to the other people who the article charged did not file. Now, admittedly, I don't think that this is a strong showing of actual malice, but I think that is for the fact finder to determine. What the main thrust of our point is, the fact that the malice is inferred from the publication of the article in question."

None of the points mentioned meet the standard of New York Times. We point out that not only must the evidence show reckless disregard with convincing clarity but it must do so without any presumptions arising from falsity.

constitute an extreme departure from ordinary publishing standard if the jury should find the Appellee to be a 'public figure'." [19] On the other hand, appellant claims in reply that there was no evidence of actual malice within the meaning of *New York Times* and its progeny. It urges that as appellee was seeking to recover punitive damages and "consequently, had every reason to introduce any evidence available to her which would show actual malice, including any which would show knowing falsity or reckless disregard of truth or falsity" and as she "produced no such evidence when it was germane to an issue in the case", remand is pointless, particularly since the evidence necessary to establish malice under the *New York Times* rule is greater in quantum than that needed to show actual malice under state libel rules.

The case was tried in the full glare of *New York Times* and its progeny.[20] As we have pointed out appellant made clear that it was relying on first amendment guarantees of freedom of speech and press in its pleadings and arguments during trial. Despite this, appellee was content to rely on the fact that the publication was libelous *per se*, standing on the common law presumption of malice arising on such publication. We note, however, that she was seeking punitive damages and a showing of actual malice in the common law sense, at the least, would have probative value with respect to the amount awarded, even if such showing would not be required to permit the jury to find punitive damages

19. Of course, we have already determined, *supra*, that the "actual malice" test applies equally with respect to public officials and public figures.

20. We observe that in *Greenbelt Cooperative Publishing Association, Inc. et al. v. Bresler*, 253 Md. 324 (1969), now before the Supreme Court on writ of certiorari to this Court, 396 U. S. 874 (1969), there was no question before us with respect to the status of Bresler as a public official or public figure or the test to be applied to prove actual malice. It was conceded that he was a public figure and the case went to the jury on a charge, without objection, imposing upon him the burden to prove actual malice within the *New York Times* rule. In *Bresler* we did discuss the sufficiency of the evidence to establish actual malice but we do not believe that the facts there and the facts here are apposite.

(which point we do not consider). The case was fairly tried as far as appellee was concerned. If she could have adduced evidence sufficient to prove actual malice in the constitutional sense, we think it a reasonable conclusion that she elected not to do so. We held in *Petropoulos v. Lubienski,* 220 Md. 293, 302, where a builder had failed or overlooked to prove with certainty the value of his services, that he was not entitled to a remand for the purpose of supplying the proof omitted, after finding the lower court not clearly erroneous in disallowing a claim therefor on lack of such proof. In the circumstances here, we do not think that appellee is entitled to a remand for the purpose of supplying proof, if she could, of actual malice in the constitutional sense.

We are fully aware that the test here applied to prove actual malice is a harsh one and that proof under it is difficult. But the Supreme Court recognized this and was not deterred. It said in *St. Amant,* at 731-732:

> "It may be said that such a test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity. Concededly the reckless disregard standard may permit recovery in fewer situations than would a rule that publishers must satisfy the standard of the reasonable man or the prudent publisher. But *New York Times* and succeeding cases have emphasized that the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies."

In view of our holding, we do not reach the question presented on the cross-appeal.

*Judgment reversed; costs to be paid by appellee.*