## THOMAS C. WEEKS vs. THE NEWS PUBLISHING COMPANY, A CORPORATAON.

*Libel: pleading; averments in declaration innuendo, and induce-
ments; special meanings to words of ambiguous import.*

In order to constitute a libel it is not necessary for the pub-
lication to charge a crime, or the having of a contagious
disease; any words which impute to one conduct or qualities
likely to injure his character, to degrade, or expose him to
ridicule or public hatred are *per se* libelous.        p. 130

In an action for libel a demurrer admits the publication by
the defendant, its falsity and malice, but does not admit
that the words published are in themselves, or as explained
by the innuendo, actionable; nor does it admit that by
themselves, or in connection with the colloquium and induce-
ment, they are capable of the meaning ascribed to them in
the innuendo.                                          p. 131

The office of the innuendo is to explain the words of the libel
and to give them their true meaning; it can not introduce
new matter, nor enlarge or add to the sense of the words
declared on, nor properly impute to them a meaning not
justified by the publication, either when read alone or in
connection with the inducement and colloquium.        p. 131

If it be conceded that an article as interpreted by the innuendo,
is actionable, the question whether the innuendo is good,
that is, is warranted by the article when read with the induce-
ment and colloquium, is for the Court.                p. 131

A newspaper during a political campaign published a letter,
of which the following is a part:

> "A man may not be responsible if a black sheep
> here and there becomes his adherent, but when the
> 'line up' is as general in character as in the present
> primary contest, it must be accepted as defining a can-
> didate's status."

Then followed a list of names, including the plaintiff's, whom the writer stated he believed to be in favor of the candidate.

"We can safely add to this 'company' an almost unanimous vote of the disreputable saloons, the gambling hells, the bawdy houses, and others of that ilk who, from the nature of their trade, require 'protection' from those higher up."

The inducement alleged merely that the plaintiff was an attorney at law in good standing, while the averment of the colloquium was that the article was published of the plaintiff individually and as an attorney; the declaration charged that the defendant meant by the publication that the plaintiff as a black sheep was a man of criminal character and unfit to practice his profession and that he belonged to the criminal classes mentioned. *Held,* that the publication did not expressly charge that the plaintiff was of the criminal classes named, as alleged in the declaration; and the writer placed the plaintiff and the others named with him in a different class from those whom he referred to in the subsequent paragraph, the keepers of gambling hells, etc.     p. 133

It was further held that taking the article as a whole, and allowing the words their natural significance, there was nothing in the publication, or in the inducement or colloquium, to justify the meaning ascribed to it in the declaration; and the innuendo being bad in that it attempted to give a meaning not fairly deducible from the publication, the demurrer was sustained.     p. 133

The term "black sheep" could not be given the meaning of a criminal character in the absence of some allegation in the declaration that it was so intended and understood.     p. 133

Where words are ambiguous, or have an actionable and a non-actionable meaning, the actionable character sought to be given them in the innuendo must be supported by such an averment and colloquium as will warrant such defammatory meaning.     p. 135

*Decided January 9th, 1912.*

Appeal from the Baltimore City Court (BOND, J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, BURKE, THOMAS, PATTISON, URNER and STOCK-BRIDGE, JJ.

*J. Booker Clift,* for the appellant. ·

*Leon E. Greenbaum,* for the appellee.

THOMAS, J., delivered the opinion of the Court.

This was an action for libel against Frank A. Munsey, proprietor of *The Baltimore News,* and *The News Publishing Company,* a corporation, and the appeal is from a judgment on demurrer to the declaration in favor of the defendant, *The News Publishing Company,* process not having been served on the other defendant.

The *narr.* alleges that the plaintiff was "an attorney-at-law in good standing and repute in the practice of his profession in the Courts of Baltimore City and elsewhere," and enjoyed in the community "a reputation as a moral, law abiding and respectable citizen" * * * "of professional integrity and honesty in the practice of law;" and that the defendants, on the first day of April, 1911, "falsely and maliciously printed and published and caused to be printed and published of and concerning the plaintiff individually and in his professional capacity as an attorney-at-law" in *The Baltimore News,* "a daily journal published in the City of Baltimore, the following false, malicious and wicked libel, to wit:

'There is a good old adage that you can judge a man by the company he keeps, and this ought to hold good in politics. A man may not be responsible if a black sheep here and there becomes his adherent, but when the 'line up' is as general in character as in the present primary contest, it must be accepted as defining a candidate's status. I believe I am correct in putting down the following list as Mr. Preston's

friends:' 'Judge Bill' Garland, 'Hon.' Harry Wolf and 'Tom' Weeks, counsel for 'Willie' Downs, 'Sonny' Mahon, 'The' Kelly, 'Bob' Padgett, 'Hon.' George Konig, all the 'Gas' Councilmen, including those indicted by the Grand Jury.'

'We can safely add to this 'company' an almost unanimous vote of the disreputable saloons, the gambling hells, the bawdy houses, and others of that ilk who, from the nature of their trade, require 'protection' from those higher up.'

'In lining this gentry up for Mr. Preston I don't think I am crediting him with any Mahool votes. Now, what is the exhibit on the other side? Mr. Mahool cannot lay claim to please any of the 'elements' I have named, but he seems to have lined up with the great body of citizens who have never made politics a business, the sober workingmen, the small business men and those of our leading citizens who have been free from political graft. He has also the bulk of the 'Old Guard' who fought with Wallis against the gentry I have enumerated; in fact, he has such a large majority of the decent people with him that the ward heelers, toughs and criminal classes hate him. 'We love him for the enemies he has made' in the cause of right and

JUSTICE.

'BALTIMORE, March 30.' "

The declaration then charges that the defendants meant by said publication "that the said plaintiff, speaking of him individually and as an attorney-at-law as a 'black sheep' was a man of criminal character and unfit to practice his profession as an attorney-at-law; as one belonging to the criminal classes, and as of the company of keepers of disreputable saloons, gambling hells, bawdy houses, and others of that ilk, who from the nature of their trade require protection from those higher up; and intending thereby to bring the plaintiff into public scorn, contumely and disrepute among his neighbors, clients and acquaintances."

To an honest and good man, who has won and enjoys public confidence and esteem, honor and character are no less sacred than life or property, and it is as much the duty of others to respect his title to the former as it is their obligation to avoid violating his right to the latter, and the law should be ample for their protection.

There can be no doubt that if the article complained of contained a false charge that the plaintiff "was a man of criminal character and unfit to practice his profession," or that he "belonged to the criminal classes," such as "keepers of disreputable saloons, gambling hells and bawdy houses" it would be libelous. Indeed it may be stated as the settled law of this State, that in order to constitute a libel it is not necessary that the publication should charge one with the commission of a crime or with having a contagious disease, but any words which impute to him conduct or qualities tending to injure his character, or to degrade him, or which expose him to contempt, ridicule or public hatred are *per se* libelous. In the case of *Hagan* v. *Hendry,* 18 Md. 191, CHIEF JUDGE BOWIE quotes the statement in 1 *Amer. Lead. Cases,* 116 (ed. of 1857), that "any publication injurious to the social character of another, and not shown to be true, or to have been justifiably made, is actionable as a false and malicious libel." In the case of *Snyder* v. *Fulton,* 34 Md. 135, CHIEF JUDGE BARTOL adopts the view of CHANCELLOR KENT (1 *Kent's Comm.,* 620), that "Expressions, which tend to render a man ridiculous, or degrade him in the esteem and opinion of the world, would be libelous if printed. though they would not be actionable if spoken. So. if they tend to injure his reputation and expose him to public hatred, contempt or ridicule." And in the more recent case of *Goldsborough* v. *Orem & Johnson,* 103 Md. 681. this Court, speaking through JUDGE BURKE, said: "A false and malicious printed or written publication which imputes conduct, or qualities tending to disparage, or degrade the plaintiff, or expose him to contempt, ridicule or public hatred, or prejudice his private character or credit, is

libelous *per se.*" Similar statements may be found in *White* v. *Nickolls*, 3 Howard (U. S.), 266; *Odgers on Libel and Slander*, star pages 19 and 20, and 13 *A. & E. Ency. of Law*, pp. 299 and 220 (2nd ed.), where many cases, English and American, are cited in support of the rule.

But the real question presented by the demurrer in this case is not whether it is actionable to publish of an attorney-at-law a statement that he is a man of criminal character and unfit to practice his profession, or that he belongs to the criminal classes, but whether the article referred to is susceptible of the meaning ascribed to it in the declaration.

The demurrer admits that the article was published by the defendant, and that it is false and malicious; but it does not admit that the words published, in themselves, or as explained by the *innuendo*, are actionable, nor does it admit that they are, when read by themselves, or in connection with the inducement and *colloquium*, capable of the meaning ascribed to them in the *innuendo*. If it be conceded that the article, as interpreted by the *innuendo*, is actionable, the question whether the *innuendo* is good, that is to say, whether it is fairly warranted by the article when read in connection with the inducement and *colloquium*, still remains as a matter of law for the Court. It is the office of the innuendo to explain the words of the libel and to give to them their true meaning. It can not, however, introduce new matter, or enlarge or add to the sense of the words declared on, or properly impute to them a meaning not justified by the publication, either when taken alone or in connection with the inducement and *colloquium*. *Lewis* v. *Daily News Co.*, 81 Md. 466; *Dorsey* v. *Whipps*, 8 Gill, 462; *Haines* v. *Campbell*, 74 Md. 158; *Avirett* v. *State*, 76 Md. 510; *Barnes* v. *State*, 88 Md. 347; *Goldsborough* v. *Orem & Johnson, supra*. In the case of *Avirett* v. *State, supra*, JUDGE McSHERRY, after referring to the statement of LORD TENTERDEN, C. J., in *Harvey* v. *French*, 1 Cr. & M. 11, that "It is quite clear from all the modern authorities that a court must read words in the sense in which ordinary persons, or in which we our-

selves out of court, reading the paragraph, would under-
stand them," said: "They can not be enlarged or extended
by an *innuendo* no matter how strongly an *innuendo* may
impute an offensive meaning to them. *Commonw.* v. *Snell-
ing,* 15 Pick. 321. Whether an *innuendo* is good in law,
that is to say, whether it is fairly warranted by the language
set forth in connection with the inducement and *colloquium*
is obviously matter of law. *Solomon* v. *Lawson,* 8 Q. B. 828.
As the *innuendo* can not enlarge, extend or add to the sense
or effect of the words set forth, or properly impute an offense
which the publication either in itself or in connection with
the inducement and *colloquium* does not charge or fairly
imply, it follows that the *innuendo,* which is simply equiva-
lent to *scilicet* or *id est,* and whose whole office is to explain
the effect of the words used, can not, by enlarging the meaning
of the words, make an indictment good which, without that
*innuendo,* would be bad. If therefore the words set forth in
the first count of the indictment, either in themselves or in
connection with the inducement and the *colloquium* do not
involve a charge against JUDGE HOFFMAN, the *innuendoes*
can not make them do so; *Solomon* v. *Lawson, supra;* and
if the *innuendoes* attempt to do this by assigning as the cor-
rect and natural meaning of the words a construction not
fairly inferable from them, or not fairly deducible from the
words as explained by the *colloquia* and the extraneous facts
averred, the demurrer to that count should have been sus-
tained."

Applying these rules to the case at bar, we find that the
inducement alleges merely that the plaintiff was an
attorney-at-law in good standing, etc., while the averment
of the *colloquium* is that the article was published of and
concerning the plaintiff "individually" and as an attorney-
at-law. The publication does not expressly charge that the
plaintiff "was a man of criminal character and unfit to prac-
tice his profession as an attorney at law," or state that he
"belonged to the criminal classes," such as "keepers of dis-
reputable saloons, gambling hells and bawdy houses, and

others of that ilk." On the contrary, the apparent 'intention of the writer was to place the plaintiff in another and different class, for after naming a number of persons, including the plaintiff, as the friends of Mr. Preston, he then, in another paragraph, states that, in addition to the person so named, Mr. Preston had as his supporters "an almost unanimous vote of the disreputable saloons, the gambling hells, the bawdy houses, and others of that ilk who, from the nature of their trade, require 'protection' from those higher up." The statement that Mr. Preston was supported by the persons named in the first paragraph of the article, and that he would also receive the votes of those described in the second paragraph, does not imply that those mentioned in the first paragraph belonged to the same class as those referred to in the second. Reading the article as a whole, and allowing the words employed their natural significance, we fail to find anything in the publication itself, or in the inducement and *colloquium,* to justify the meaning ascribed to it in the declaration. The *innuendo* being therefore bad, in that it attempts to give to the article a meaning not fairly deducible from the publication, inducement and *colloquium,* the demurrer was properly sustained.

The only charge that the article could be properly said to contain is that the plaintiff, and the others named, were "black sheep". But we are not required in this case to determine whether it would be libelous to publish of an attorney at law, engaged in the practice of his profession, a false statement in writing that he was a "black sheep". The declaration charges that the article meant that the plaintiff was a man of criminal character, etc., and it is obvious that the term "black sheep" could not be given such a meaning, in the absence of some allegation to show that it was so intended and understood. It is said in *Bullen and Leakes Precedents of Pleadings,* p. 305 (3rd ed.), that "where the words are innocent or uncertain in their natural meaning, and are actionable only in consequence of the peculiar mean-

ing conveyed by them on the particular occasion, as calling a man a 'lame duck', a 'black sheep', or saying that he is 'forsworn', or where words are used ironically, it is necessary to add an *innuendo* or statement of the meaning intended by the words, whereby they are rendered actionable."

"In cases of the kind, it was formerly necessary to insert in the declaration, by way of inducement, a prefatory averment of the meaning of the words, and then by *innunendo* to allege that they were used, to convey that meaning." This was changed by section 61 of the Common Law Procedure Act, 1852, which made it unnecessary to have an introductory averment of the meaning of the words, and provided that the meaning could be stated in the *innuendo*. *Hemmings* v. *Gasson*, 27 Law Journal, Q. B. (1858) 252; *Bullen & Leake's Precedents of Pleadings, supra.* It is accordingly stated in *Odgers on Libel and Slander*, star page 23, that "It is libelous to call a man a 'black-leg' or a 'black-sheep'. But there should be an averment that these words mean a person guilty of habitually cheating and defrauding others." Following the former practice, Parke, B, in the case of *McGregor* v. *Gregory*, 11 M. & W. 287, on page 295, said: "We think that the averment of the meaning of the term 'Black-sheep' is properly introduced by way of inducement," and this is the rule that still prevails in this State, where it is claimed that the words were used to convey a particular meaning other than that naturally and ordinarily ascribed to them. *Peterson* v. *Sentman*, 37 Md. 140; *Brinsfield* v. *Howeth*, 107 Md. 278; *DeWitt* v. *Scarlett*, 113 Md. 47. In 1 *Poe's P. & P.*, sec. 173 (3rd ed.), Mr. Poe repeats the statement of the Court in *Peterson* v. *Sentman, supra*, that "Words will not be understood to impute a crime if, in their milder sense, they have another and harmless meaning, unless the connection in which they are used and applied would give them that effect." And the learned author, upon the authority of the cases cited in

the note, adds that in determining whether "words are action-able or otherwise, the rule is this: they take their actionable character from the sense in which they appear to have been used, and that in which they are likely to be understood." This rule has been more recently recognized in *Brinsfield* v. *Howeth, supra,* and *De Witt* v. *Scarlett, supra.* Where then, the words are ambiguous, or have an actionable and a non-actionable meaning, the actionable character sought to be given to them in the *innuendo,* that is to say, the sense in which the plaintiff avers they were used, must be supported by such an averment and *colloquium* as will warrant the defamitory meaning ascribed to them in the *innuendo.* 1 *Poe's P. & P., supra; Dorsey* v. *Whipps, supra; Brinsfield* v. *Howeth, supra; De Witt* v. *Scarlett, supra.*

As there is nothing in the article itself, or in the declaration, to justify the meaning ascribed to the publication in the *innuendo,* there was no error in the ruling of the Court below on the demurrer, and the judgment appealed from must be affirmed.

*Judgment affirmed, with costs.*