# WERBER *v.* KLOPFER

[No. 121, September Term, 1970.]

*Decided January 20, 1971.*

The cause was argued on November 16, 1970, before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ., and reargued on December 7, 1970, before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ., and ROBERT C. MURPHY, Chief Judge of the Court of Special Appeals, and CHARLES E. ORTH, JR., Associate Judge of the Court of Special Appeals, specially assigned.

*Thomas A. Farrington,* with whom were *Sasscer, Clagett, Channing & Bucher* on the brief, for appellant.

*Rose M. Mattingley* for appellee.

McWilliams, J., delivered the opinion of the Court. Murphy, J., dissents. Dissenting opinion at page 503 *infra*.

Duke University is just about the only thing the parties have in common. The appellant (Werber) is a loyal, vociferous alumnus. Even his children are alumni. The appellee (Klopfer), although not an alumnus, is a member of the faculty. Werber, now a successful insurance salesman and once a professional baseball player, is an athletics buff. Klopfer, an American citizen, was born in Germany. He has a wife and three children. He is a Quaker, an internationally known zoologist and a political activist. "He lives [says his counsel] in a vortex of leftist activity in the Duke-Durham area." It seems fair to say that Klopfer is about as far to the left as Werber is to the right.

On 24 April 1968 Frank L. Ashmore, Vice President for Institutional Advancement, presented a report, entitled "A Crisis in Conscience," to the Greensboro chapter of the Alumni Association, "describing unrest at Duke University following the assassination of Dr. Martin Luther King, Jr., on 4 April 1968." Werber, concluding it was time for him to speak up, wrote and circulated a lampoon, likewise entitled "A Crisis in Conscience," but subtitled "a report that *should have been made*" to the Greensboro chapter. (Emphasis added.) The paragraph of the lampoon with which we shall be concerned follows (for the full text see the appendix which follows this opinion) :

> "Unfortunately, we have permitted to enter the University too large a number of students who are away out in left field and these dissidents are constantly a source of embarrassment to us with our alumni. They have had on campus to harangue the student body over the last several years a procession of sex deviates, communists, advocates of narcotics and militant blacks; Harriet Pimple, Klopfer, Aptheker, Timothy Leary, Ginsberg, Adam Clayton Pow-

ell, Stokely Carmichael, Howard Fuller, Martin Luther King, and you name it. They did have one dedicated American in to speak, General Lewis Hershey, but they ridiculed him roundly."

Werber wrote on the copy he sent to Klopfer, "See page 5. You should have been placed under [a] classification of 'Bearded Kook' or 'Goatherd'." On 15 October 1968 he sent the following letter to Klopfer:

"Dear Doctor Klopfer:
"While on the Duke campus for a Homecoming visit, it was mentioned to me by friends that you contemplated filing a suit against me.
"I haven't the foggiest concerning the basis upon which you would bring the suit, but I urge you to do it. Perhaps we could get your goat into the courtroom and dye his beard black. The jury could have fun guessing which was Klopfer and which the goat.
"A good lawyer should be able to dig into your background to a considerable extent and it ought to be of great interest to Duke Alumni everywhere to become more familiar with your associations and points of view.
"I'd love to have a position of authority at Duke University right now. It needs a good house cleaning, and you would be right at the top of my list. I'd like to bounce you out personally."

Klopfer filed his suit in the Circuit Court for Prince George's County on 18 October 1968. He alleged that Werber "maliciously and recklessly" called him "a sex deviate, a communist, an advocate of narcotics and a militant black" all of which characterizations, he declared, were false and "malicious per se." He alleged injury to his reputation and he claimed "punitive and exemplary damages" in the amount of $250,000. We understand it to be conceded that Klopfer's reputation was not ad-

versely affected. Indeed his counsel has agreed that "there is no proof of any specific or out-of-pocket damages." The case came on for trial on 12 November 1969 before Digges, C. J. (now a member of this Court), and a jury. After testifying in his own behalf Klopfer called Werber to the stand and proceeded to examine him as an adverse witness. Werber testified that he did not intend to categorize Klopfer as a sex deviate, a communist, an advocate of narcotics or a militant black. He had no knowledge, direct or indirect, that Klopfer was a sex deviate, a communist or an advocate of narcotics. He said that obviously he was not a "militant black" but he thought he was "militant in his advocacy of draft avoidance" and in his advocacy "of representing colored people." Judge Digges refused to direct a verdict for Werber at the close of the plaintiff's case. Werber testified in his own behalf and again his motion for a directed verdict was refused. Judge Digges directed a verdict for Klopfer and he instructed the jury that their verdict, in respect of general damages, should be at least one dollar and in respect of punitive damages, whatever amount they found Klopfer was entitled to recover. Both sides noted exceptions. The jury assessed general damages in the amount of one dollar and punitive damages in the amount of $5,000. Following the denial of Werber's motion for judgment n.o.v. and the entry of judgment absolute his appeal to this Court was filed within the required time.

From Klopfer's testimony we learn that he attended Abbington Friends' School in Philadelphia and public schools in Los Angeles. He received a bachelor's degree from the University of California at Los Angeles. He taught school for a year and then became a graduate student at Yale University. After receiving his doctorate he obtained from the National Institute of Mental Health a fellowship for a year's study at Cambridge, England. Following that, in 1958, he became a member of the Department of Zoology at Duke. From time to time there-

after he has been employed by the United States as a consultant, a chore requiring security clearance at one level or another. He believes, as a Quaker, that he is "obliged to avoid situations that promote violence and to simply forswear the use of violent means." In 1964 he was arrested in connection with a movement to force the integration of a local restaurant. His appeal for funds to defray the expenses of the ensuing litigation and his ultimate victory in the Supreme Court received nationwide publicity. He regularly advised students in respect of legally acceptable methods of avoiding the draft. He was absent from the campus during the demonstrations following the assassination of Dr. King. When he returned the "vigil" (see appendix) was still in progress. He indicated his support of the "vigil" and he told the participants that it "was a much more dignified form of protest" than the earlier demonstrations he heard about after his return to the campus.

Testifying as an adverse witness in Klopfer's behalf Werber said that "what * * * [he] was doing in the pamphlet was to list those areas that seemed to be of particular interest *to the people who were doing the inviting* of these people to talk." Klopfer was not "specifically mentioned in any of these categories * * * [he] was in them solely and entirely as a person who was active and militant and a public figure in the affairs of integration and draft avoidance." (Emphasis added.)

Werber urges us to undo what has been done below and to enter a judgment in his favor. He contends that his comment was not libelous, that it was simply "a free swinging poke at the ideological left," and that, in any event, it was privileged. His claim of privilege, were we obliged to consider it, would, of course, present the now familiar conflict between the "profound national commitment" to the "uninhibited, robust, and wide-open" debate of public issues, *New York Times Co. v. Sullivan,* 376 U. S. 254, 270 (1960), and the ancient principle that individuals, regardless of notoriety or renown, should

enjoy immunity from false and defamatory attacks. 50 Am.Jur.2d, *Libel and Slander* § 1. *New York Times* has been described as prolific and, undeniably, the impact of its progeny [1] upon the law of libel has been substantial. We have been acutely aware of that effect since our decision in *Greenbelt Coop. Pub. Assn., Inc. v. Bresler*, 253 Md. 324 (1969), was reversed. *Greenbelt Coop. Pub. Assn., Inc. v. Bresler*, 398 U. S. 6 (1970). But since we think Werber's statement was not libelous there is no need to discuss his claim of privilege and the concomitant issues of "actual malice," as defined by the Supreme Court, and its effect, if any, upon the traditional notions of libel per se. And in reaching our conclusion we have been mindful of the admonition of the Supreme Court that "we must * * * review the evidence * * * [and that] we must make an independent examination of the whole record * * * so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." *Greenbelt, supra; New York Times, supra.*

Werber testified, as a part of Klopfer's case, that he caused to be printed 1,000 copies of the lampoon. He sent copies only to those members of the Alumni Association whom he "knew personally." He sent "perhaps four, five or six" to people who were "interested generally in the affairs of Duke University" but who were not members of the Alumni Association. He also mailed copies to a few faculty members and later to any faculty member who asked for one. Outside of the one he sent to Klopfer he said the "remainder of the thousand" was still in his office. Since there is no evidence to the contrary it seems fair to assume that the lampoon was not read by anyone

---

1. The progeny has been traced by many editorial genealogists. *E.g.*, Kalven, *The Reasonable Man and the First Amendment: Hill, Butts and Walker*, 1967 Sup. Ct. Rev. 267; Merin, *Libel and the Supreme Court*, 11 W. & M. L. Rev. 371 (1969) ; Bertelsman, *The First Amendment and Protection of Reputation and Privacy—New York Times v. Sullivan and How It Grew*, 56 Ky. L. J. 718 (1968). Judge Orth, for this Court, discussed the cases in detail in *The A. S. Abell Co. v. Barnes*, 258 Md. 56 (1970).

not interested in or in some way associated with Duke University.

Even upon a preliminary consideration of the paragraph in question it is at once obvious that it is aimed at "these dissidents," the "students who are away out in left field." They are the ones who "have had on campus" the "procession" of various people "to harangue" the student body. Clearly what was meant is that "they" *invited* these people to come to the campus to do the haranguing. Of course, there was no need for Klopfer to come to the campus—he was one of its permanent residents. Nor is there any evidence that he ever "harangue[d] the student body." He said he once had been asked by Duke's chaplain to speak at the regular Sunday morning worship service and that some years back he had been invited to address a group of student nurses. He accepted both invitations. Harriet Pimple was identified by Werber as a "New York female attorney who makes a habit of going around to colleges and talking on sex." There is nothing in the evidence suggesting she could be classified as a sex deviate, a communist, an advocate of narcotics or a militant black. Werber identified Ginsberg as a "purveyor of pornography" but there is nothing to suggest that any of the other categories apply to him. Thus it would seem that although some of the individuals named might fit into one or another of Werber's four categories, at least three, Pimple, Ginsberg, and Klopfer, belonged in still other, unmentioned, categories. Indeed, Werber suggested "Bearded Kook" and "Goatherd" as appropriate categories for Klopfer.

Werber makes much of the fact that the named individuals are separated from the specified pursuits he considered objectionable by a semicolon which, he insists, effects a "positive break" creating two separate and distinct groups. As we see it this would equate the semicolon with the words "and also." Klopfer, on the other hand, might argue (he did not) that the words "such as" would be the true meaning of the semicolon. Without

more, we think Werber's argument is a little thin. None of the authorities [2] on punctuation puts the semicolon quite that high. When viewed in context, however, Werber's argument acquires a plausibility we find persuasive.

We have assumed, as we have said, that the lampoon was read only by alumni who were friends of Werber, a few people interested in the university, and some faculty members. There is nothing in the evidence to show that it was ever seen by anyone else. We can assume further those who may have read it were reasonably perceptive, generally well informed people who were also knowledgeable about the campus, the faculty personnel and student activities. They would have known that Klopfer had not been invited to come to the campus and that he was not a "militant black." They might have known that he was the author of an article condemning the use of drugs. There is no evidence whatever that any of them, or indeed anyone else, thought he was a communist or a sex deviate. Such as it is the evidence is to the contrary. They would have known about the "dissidents" and the "students * * * out in left field." They would have understood, of course, that Klopfer, an admitted left wing activist, was being lumped with other individuals having leftish tendencies, but none of whom, on this record at least, are reputed to be sex deviates. Aptheker is the only one who was identified with the Communist Party and Leary was the only one said to be an advocate of narcotics, limited, it must be observed, to LSD.

Similar in most respects to the instant case is *Weeks v. The News Publishing Co.*, 117 Md. 126 (1912). There the trial judge sustained the demurrer to the declaration in an action for libel against the publisher of the Baltimore News. Judge Thomas, for the Court, said:

"The *narr.* alleges that the plaintiff was 'an

2. *E.g.*, H. W. Fowler, *A Dictionary of Modern English Usage* 589, (2d ed. 1965); W. Follett, *Modern American Usage* 420 (1966); T. M. Bernstein, *The Careful Writer* 373 (1965).

attorney-at-law in good standing and repute in the practice of his profession in the Courts of Baltimore City and elsewhere,' and enjoyed in the community 'a reputation as a moral, law abiding and respectable citizen' * * * 'of professional integrity and honesty in the practice of law;' and that the defendants, on the first day of April, 1911, 'falsely and maliciously printed and published and caused to be printed and published of and concerning the plaintiff individually and in his professional capacity as an attorney-at-law' in *The Baltimore News,* 'a daily journal published in the City of Baltimore, the following false, malicious and wicked libel, to wit:

' "There is a good old adage that you can judge a man by the company he keeps, and this ought to hold good in politics. A man may not be responsible if a black sheep here and there becomes his adherent, but when the 'line up' is as general in character as in the present primary contest, it must be accepted as defining a candidate's status. I believe I am correct in putting down the following list as Mr. Preston's friends: 'Judge Bill' Garland, 'Hon.' Harry Wolf and 'Tom' Weeks, counsel for 'Willie' Downs, 'Sonny' Mahon, 'The' Kelly, 'Bob' Padgett, 'Hon.' George Konig, all the 'Gas' Councilmen, including those indicted by the Grand Jury."

' "We can safely add to this 'company' an almost unanimous vote of the disreputable saloons, the gambling hells, the bawdy houses, and others of that ilk who, from the nature of their trade, require 'protection' from those higher up." '

\* \* \*

"\* \* \* The publication does not expressly

charge that the plaintiff 'was a man of criminal character and unfit to practice his profession as an attorney at law,' or state that he 'belonged to the criminal classes,' such as 'keepers of disreputable saloons, gambling hells and bawdy houses, and others of that ilk.' On the contrary, the apparent intention of the writer was to place the plaintiff in another and different class, for after naming a number of persons, including the plaintiff, as the friends of Mr. Preston, he then, in another paragraph, states that, in addition to the person so named, Mr. Preston had as his supporters 'an almost unanimous vote of the disreputable saloons, the gambling hells, the bawdy houses, and others of that ilk who, from the nature of their trade, require "protection" from those higher up.' The statement that Mr. Preston was supported by the persons named in the first paragraph of the article, and that he would also receive the votes of those described in the second paragraph, does not imply that those mentioned in the first paragraph belonged to the same class as those referred to in the second. Reading the article as a whole, and allowing the words employed their natural significance, we fail to find anything in the publication itself, or in the inducement and *colloquium,* to justify the meaning ascribed to it in the declaration. The *innuendo* being therefore bad, in that it attempts to give to the article a meaning not fairly deducible from the publication, inducement and *colloquium,* the demurrer was properly sustained." *Id.* at 128-129, 132-133.

The separation by paragraph in *Weeks* is, to be sure, somewhat more definite than the separation by semicolon here but it could be argued that, in *Weeks,* the words, "We can safely add to this 'company' " tie the individuals and the categories together quite as effec-

tively as Klopfer says the semicolon does in the case at bar. But if the semicolon, in effect, means "and also," and we think it does, then we see little if any difference between *Weeks* and this case.

The Supreme Court made an independent examination of the whole record in *Greenbelt, supra,* and upon that investigation it concluded that the "the word 'blackmail' in * * * [those] circumstances was not slander when spoken, and not libel when reported in the Greenbelt News Review." Mr. Justice Stewart, for that Court, said:

> "It is simply impossible to believe that a reader who reached the word 'blackmail' in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable. Indeed, the record is completely devoid of evidence that anyone in the city of Greenbelt or anywhere else thought Bresler had been charged with a crime." *Id.* at 14.

Our independent examination of the record in the case at bar leads us to a like conclusion. We find it impossible to believe that any of the readers of Werber's lampoon would not have understood that the inclusion of Klopfer in the list of left wing individuals was merely to identify him as a fellow with leftist leanings, a circumstance which he freely admits. Indeed, to paraphrase the language of Mr. Justice Stewart—the record is com-

pletely devoid of evidence that any of the readers of the lampoon thought Klopfer had been accused of being a sex deviate, a communist, an advocate of narcotics or a militant black. The judgment of the court below will be reversed and a judgment for costs will be entered in favor of Werber against Klopfer.

*Judgment reversed.*
*Judgment entered in favor of the appellant against the appellee for costs in this Court and in the court below.*

APPENDIX

## A CRISIS IN CONSCIENCE

A report that should have been made to the Greensboro Alumni Association on April 24, 1968 by Frank L. Ashmore, Vice President for Institutional Advancement describing the unusual student activity at Duke University before, and following the death of Dr. Martin Luther King, Jr., on April 4, 1968.

**Introduction**

Recent events on the campus of Duke University which have involved students, members of the faculty and administration officials have been so weird and unbelievable that they have captured widespread public attention.

These events have been so unacceptable to our more responsible alumni and parents of our students that I have been assigned the responsibility of explaining them away. This will take some doing and requires that you be provided with some background information.

You may not be aware of this, but Duke has more needs for money than you alumni can provide, and the same remains true for all of the money we can coax out of foundations and corporations. So, we have been compelled to tap the pocket of the general taxpaying pub-

498

lic through the never ending largesse of our deficit minded Federal Government.

Unlike you loyal alumni and the foundations and the philanthropic minded corporations, your Government is in the business of coercion and blackmail. When you take money from the Federal Government, you submit to bribery, and you surrender your freedom of operation by putting your name on the dotted line.

## Dr. Knight's Activity

You probably don't know this either, but in order to get this money, Dr. Knight had to sign an Assurance of Compliance with Title VI of the Civil Rights Act of 1964, and he did so sign on January 13, 1965.

The Department of Health, Education and Welfare is the muscle behind this "Assurance" gimmick, and once they have induced you to accept the bribe they are naturally going to demand that you do what they tell you to do. I am sure you can understand that, and I'm sure that all of you would be willing to sacrifice in principle for some ten to fourteen million dollars. If you cannot be bought with those figures, then you must have studied at Duke under an entirely different type of administration.

Shortly after the signing by Dr. Knight, H.E.W. told him to produce the constitutions of all fraternities and sororities to see if any discriminatory clauses pertaining to "white caucasians only" existed. Dr. Knight dutifully complied and used his own authority to coerce by threatening to deny to fraternities and sororities the use of university facilities. Fortunately, our liberal minded students and faculty members saw nothing in this demand as an encroachment on personal freedom, and, also fortunately, the main body of our students were so busy minding their own business as not to challenge this usurpation of their right of selection in matters of personal association.

You must understand, of course, that the reason for

the Government handing out money, which they borrow from you without your consent, is political. So, to stay in the good graces of H.E.W. and keep this debt money coming, we had to go out and recruit a quota of blacks. Don't misunderstand now. These are qualified blacks, selected with care, because they are expected to do the work; however, practically all of them are lacking in funds, so we pay them to come to Duke.

Those of you who have children at Duke who entered on a competitive basis, and for whom you pay in full, may question our policy of admitting blacks on a quota basis and paying them to come; however, you would be more in sympathy if you had H.E.W. inspection teams on your back and all this money was dependent upon your compliance. You want us to have a good physical plant don't you, and what of it if we trade away a little moral principle?

H.E.W. is always inquisitive about blacks on the faculty and blacks in administrative offices and the mixing of colors in hospital rooms. Their inspection team got fooled when they visited the hospital because we knew they were coming over from Chapel Hill and we scrambled while they were here and unscrambled after they were gone.

You may rest assured that we do not like the moral implications of any of this and we realized that this sacrifice of principle would catch up with us—but we needed the money.

**Student Activity**

The Negro is always asking us to forget his color—to accept him for what he is as an individual. The blacks once admitted to Duke, and while demanding full integration into every facet of the University community, were not long in organizing a wholly segregated Afro-American Society. They have learned that blackmail is the name of the game today and they were not long in showing their muscle.

They did, as you know, blockade the office of Dr. Knight and forcibly denied entrance to his office for a whole day. One of the things they demanded was that Dr. Knight resign from the segregated Hope Valley Country Club. This did not seem wholly realistic to him since he had no application pending for their segregated Afro-American Society; so to date, this issue is a stand off. Out of deference to Durham's large black population, and having no desire to inflame them, these defiant black militants were not punished. All of you will agree, I am sure, that we made a smart move there.

It is true, unfortunately, that you can't duck trouble that is looking for you, but you can, at least, buy some peace for awhile, by not being too heavy handed. This is what we always try to do.

Unfortunately, we have permitted to enter the University too large a number of students who are away out in left field and these dissidents are constantly a source of embarrassment to us with our alumni. They have had on campus to harangue the student body over the last several years a procession of sex deviates, communists, advocates of narcotics and militant blacks; Harriet Pimple, Klopfer, Aptheker, Timothy Leary, Ginsberg, Adam Clayton Powell, Stokely Carmichael, Howard Fuller, Martin Luther King, and you name it. They did have one dedicated American in to speak, General Lewis Hershey, but they ridiculed him roundly.

Okay, maybe we ought to put these kids back in line and let them know they are here to study instead of demanding whiskey in their rooms, girls in the rooms, the right to use narcotics, the right to block the free movement of others by sit-ins and lie-ins. Other schools, outside of West Point, Annapolis, V.M.I. and the like, are not having much success at disciplining their student bodies so we feel no particular compulsion in making a pioneer effort. In any event, it isn't popular today to inhibit freedom of speech or freedom of action. These kids have constitutional rights don't they? Didn't all of

you kick over the traces a time or two when you were at Duke? Sure you did.

## King Gets Shot

In our opinion, Martin Luther King was nothing more or less than an African witch doctor in the image of a Father Divine, or a Daddy Grace, or an Elder Michaux, or a Malcolm X, or an Adam Clayton Powell. All of them have bilked large numbers of black followers less intelligent than themselves.

King was attempting to extort $20,000,000,000 from the white taxpayers by means of his "poor march" on Washington. Everyone knew this. He threatened to strangle the economic life of this city if they failed to surrender to his demands.

He urged his black followers to disobey those white man made laws that were in violation of their conscience. This is preaching anarchy. We knew all of this too.

King, while in Europe prior to getting shot, likened the United States in Vietnam to Hitler's Germany and their murder of the Jews. He urged young blacks to refuse to fight in Vietnam. We knew this to be unAmerican and would not wish you to believe that we supported it.

King twice signed his name to resolutions committing black political power in the United States to work toward the destruction of the white Governments in Rhodesia and South Africa. We recognized this as black racism directed toward the murder of whites in these two countries.

King served time in jail for contempt of court and had publicly declared he would ignore an injunction against his Memphis march. Although he preached nonviolence, he was actually the biggest trouble maker in the United States for violence followed the man everywhere. He incited to violence.

We knew all of this and the facts are indisputable. Don't ask me why we let the kids at Duke place this enemy of America in a position of martyrdom. We are supposed to teach. We just slipped up, I guess.

Anyway, like the black rioters in some 125 of our nation's cities, our kids felt compelled to use this opportunity to take off on the demand spree once again. About 200 of them marched on the home of Dr. Knight and forcibly took possession. They stayed there, too, day and night, and ultimately forced the Knights to get out. Maybe we should have called the police and maybe we should have expelled all 200 of them. With the climate of permissiveness we have established and with our own surrender of moral principle, how can we get tough with anyone? It's a lot easier just to forget about the whole sorry mess. Don't you agree? Dr. Knight held a eulogy wake for King in the Duke Chapel and we felt this was a sort of a placating gesture. It wasn't this to Dr. Knight tho. Our young militants put him into the hospital in a state of exhaustion.

**The Vigil**

This you'd have to see to believe, so many misguided, uninformed kids sitting in the quadrangle protesting everything. What a disruptive and wholly immature performance. And to cap the climax, they even had Mr. Tisdale, Chairman of the Board of Trustees, joining hands and singing the black national anthem, "We Shall Overcome." (Written by Communist Pete Seegen)

This brings you up to date. It is a weird and fantastic situation, however, Duke is an old institution and won't be destroyed overnight. We expect to muddle through and hope you will bear with us while we are doing it. In any event, if you took more of a personal interest and involved yourself to the same extent as do these shaggy-haired, sideburned liberals, we wouldn't have to fight these battles alone or give in without fighting, as has been our practice.

We hope very much that you will be sympathetic to and support our position. We surely do need support from some place. We have been catching trouble from all sides. It just doesn't pay to take money you haven't

earned and then be required to dance to the other fellow's music.

Thank you.

AUTHOR'S NOTE.

The statements made are factual and will not be challenged by Mr. Ashmore, Mr. Tisdale or Dr. Knight. Dr. Knight not only signed the "Assurance" on January 13, 1965, but denied in a letter addressed to me that he had ever signed anything.

WILLIAM M. WERBER, '30

MURPHY, J., dissenting:

I readily agree with the majority that Judge Digges erred in concluding, as a matter of law, that Werber's article libeled Klopfer. I disagree, however, most emphatically, with the majority's labored holding that Werber's article *did not*, as a matter of law, libel Klopfer. On the record in this case, I think the question whether Werber libeled Klopfer by calling him a sex deviate was clearly one of fact to be submitted to the jury with appropriate instructions.

Whether a person has been defamed by another must, of necessity, be determined by an objective (rather than subjective) test, *viz.*, whether the natural and ordinary meaning and import of the words used convey to the average readership a defamatory meaning. Where words are *reasonably* susceptible of two meanings, one defamatory and the other not, it is for the jury, as a matter of fact, and not the court, as a matter of law, to determine which would be drawn by the reasonably prudent reader.

That there is, as the majority has found, one and only one *reasonable* construction of Werber's words—that they are not defamatory—is a notion plainly dispelled by the words themselves. This is what Werber wrote:

"Unfortunately, we have permitted to enter

504

the University too large a number of students who are away out in left field and these dissidents are constantly a source of embarrassment to us with our alumni. They have had on campus to harangue the student body over the last several years a procession of sex deviates, communists, advocates of narcotics and militant blacks; Harriet Pimple, Klopfer, Aptheker, Timothy Leary, Ginsberg, Adam Clayton Powell, Stokely Carmichael, Howard Fuller, Martin Luther King, and you name it. They did have one dedicated American in to speak, General Lewis Hershey, but they ridiculed him roundly."

Being unable to find that the average reader could not reasonably believe that Klopfer was being referred to as a sex deviate, I dissent from the Court's holding, and in particular to its conclusion that: "it [is] impossible to believe that any of the readers of Werber's lampoon would not have understood that the inclusion of Klopfer in the list of left wing individuals was merely to identify him as a fellow with leftist leanings."

I would reverse the judgment and remand the case for a new trial.