JAMES EMBREY, JR. ET AL. *v.* DENNIS P. HOLLY

[No. 1106, September Term, 1980.]

*Decided May 7, 1981.*

The cause was argued before GILBERT, C. J., and LISS and MACDANIEL, JJ.

*Theodore Sherbow,* with whom were *Stephen M. Hearne* and *Sherbow, Shea & Tatelbaum, P.A.* on the brief, for appellants.

*Marvin Ellin,* with whom were *Donald F. Oakley, Donn Weinberg* and *Ellin & Baker* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

### —Introduction—

A jury in the Baltimore City Court, presided over by Judge Martin B. Greenfeld, concluded that a "joke" by James Embrey, Jr., known professionally as "Johnny Walker" (Walker), was not funny. In fact, the jurors decided that the "joke" was libelous, and they awarded Dennis P. Holly, a then television news commentator in Baltimore and the butt of Walker's "joke," $25,000 in compensatory damages, $5,000 punitive damages against Walker, and $35,000 punitive damages against Walker's employer, Baltimore Radio Show, Inc., the operator of radio station WFBR. Perhaps the jury agreed with *Markel's Law,* "Humor is okay; wit can be dangerous; wise-cracking is disastrous,"[1] inasmuch as one man's "joke" may be another man's "choke."

### —The Facts—

To understand why a "joke" should prove to be such a costly remark, one must comprehend the backdrop of the comment. We shall set the scene.

A blizzard dumped 24 inches of snow on Baltimore City and environs in late February 1979. Mobility just about ceased during the storm, and public transportation, as well as police vehicles, was almost totally paralyzed.

Alerted by the media to the immobility of the police, "looters"[2] took to the streets, and they broke and entered a number of commercial establishments.[3] After gaining

---

1. *See* Clayton Fritchey, *"A Politician Must Watch His Wit,"* New York Times Magazine, July 3, 1960, p. 8.
2. "Looters" seems to be an euphemism for burglars, but by whatever name, it is criminal conduct.
3. *The Evening Sun,* on February 22, 1979, reported that the loss to City business by the looting was 30 million dollars.

unlawful entry into the shops and stores, the hoodlums literally carried off just about anything that could be moved.

While many of the police vehicles were practically immobile, vehicles of some television stations were not. Some looters were actually photographed committing the reprehensible acts of theft.

The City's newspapers printed banner stories of the wholesale burglaries, and Baltimore City received nation-wide notoriety about the "looting." Mayor William Donald Schaefer summed up the feeling of the overwhelming majority of the City's population when he decried the looting as, "a very disgraceful exhibition."

Numerous arrests were made notwithstanding the difficulty the police experienced in traversing Baltimore's snowladen, slippery streets.[4] *The Sunday Sun,* on February 25, 1979, in a front-page article by Mr. William Salganik, reported a "profile" of those arrested for looting. Mr. Salganik wrote:

> "Those arrested for looting in Baltimore last week are overwhelmingly young and poor.
>
> They are unemployed, or have been employed for only a brief time and at low wages.
>
> The majority do not have prior criminal records, and those who have been convicted in the past were almost all found guilty of minor crimes.
>
> Most are black males. Most did not finish high school. Almost all are single or divorced. Virtually none own homes."

As a part of his routine, Walker broadcasts what he terms, "Little News in the Morning." During that segment of the program, Walker says "crazy and wild things about current events." Simulated laughter and various other prerecorded sounds are played throughout the airing of "Little News in the Morning" as part of the response to Walker's jokes.

---

4. According to *The Evening Sun* of February 20, 1979, 303 arrests were made for looting.

A regular feature of "Little News" was the "Harry Horni Report." In that "report," Mr. Ron Matz assumed the fictitious role of "Harry Horni." "Horni" would telephone Walker and the two of them would engage in an *ad lib* exchange about Hollywood personalities. Walker would endeavor to create jokes in response to "Horni's" comments. Testimony disclosed that fact was sometimes mixed with fiction.

The broadcast that led to this particular litigation occurred on the morning of February 28, 1979. Apparently of the belief that the "Horni Report," taped during the broadcast at 6:15 a.m., was lacking in humor, John Elder, an engineer at WFBR, and a part-time writer for Walker, suggested the addition of another comment for use on the 8:15 a.m. rebroadcast of the "Horni Report."

"Horni" had said in the 6:15 a.m. report that Dennis Holly was entering a hospital for surgery on his knee. Walker, seemingly in response to Elder's suggestion, *ad libbed* about Holly, on the 8:15 a.m. broadcast: *"Too bad about Dennis Holly, though. Hope that comes out okay. Wonder how he hurt his knee. Probably fell down carrying that TV during the blizzard last week, right?"*[5] (Emphasis supplied.)

There is a conflict in the testimony as to whether Walker's *ad lib* was followed by the playing of a tape of "canned laughter." Walker asserts that it was so followed, but witnesses for Holly stated that it was not.

Mr. Charles Horich, Vice-president and Director of Broadcasting of WMAR-TV, told the jury that when he learned from WMAR-TV employees of the remark Walker made about Holly, he telephoned Mr. Harry Shriver, President and General Manager of Baltimore Radio Show, Inc. Horich complained to Shriver concerning the Walker remark in reference to Holly. Horich said that Shriver answered that "he would talk to Mr. Walker and respond ... in the morning." Later, Horich received a telephone call directly

---

**5.** There are no tapes of the broadcast so that no verification of the precise wording is available. Walker, however, admits the remarks as above quoted.

from Walker who asked Horich if he, Horich, "had a problem." Horich related that he replied, "That's right, . . . I . . . have a problem. Did he [Walker] make the . . . quote involving Mr. Holly on the air." Horich testified that he "asked Mr. Walker if he had said, on the radio, that Dennis Holly had hurt his knee while carrying a color television set in the streets, or something of that, something close to that, and . . . asked him if he had said that and he said he did and if I had a problem, he would give me his lawyer's name and number, and then he hung up." As events turned out, Mr. Horich's problem was really Mr. Holly's, which later became that of Walker and WFBR.

Patently, failing to see the humor in Walker's remark, Holly sued Walker and WFBR for libel. He acknowledged that his position as a television newscaster made him a "public figure" so that in order to recover from the appellants he carried the burden of proving that the allegedly libelous statement was uttered notwithstanding that it was "false and imperious," and that Walker, as agent of WFBR, made the comment "knowing that the remarks . . . would seriously injure and damage the character and reputation" of Holly. Holly also averred that the remarks were knowingly, maliciously and deliberately "done to defame . . . [him] by slander and/or libel."

At the conclusion of the evidence, Judge Greenfeld submitted the matter to the jury on issues. Those issues were resolved by the jury in favor of Holly. Embrey (Walker) and Baltimore Radio Show, Inc. (WFBR) have, figuratively speaking, sailed to Annapolis, where they have fired a virtual broadside at the judgment of the Baltimore City Court.

—*The Issues on Appeal*—

Appellants aver that:

> "I.   The trial court erred in denying Defendants' Motions for Directed Verdicts and their Motions for Judgment N.O.V. where

the evidence showed that the remark was made with humorous intent and was understood by all witnesses who heard the remark to be a joke.

II.  The trial court erred in permitting the jury to find Defendants liable for words spoken that were not actionable *per se.*

III.  The trial court erred in permitting the jury to award punitive damages.

IV.  The trial court erred in allowing the jury to award punitive damages against WFBR where WFBR neither ratified nor approved the complained of remark.

V.  The lower court erred in denying Defendants' Suggestion for Removal from Baltimore City where Plaintiff stipulated that the jury would be composed of 12 black citizens and the evidence revealed that a large segment of Baltimore's black community was sensitized to the events which would be the subject matter of this suit.

VI.  The trial court erred in permitting Plaintiff to appeal to the racial sympathies of a majority of the jury through the use of racially inflammatory words and argument.

VII.  The trial court erred in admitting into evidence the substance of remarks made by anonymous telephone callers.

VIII.  The trial court erred in denying Defendants' motion to reopen their case for the purpose of calling a newly discovered witness who possessed personal knowledge that Plaintiff had lied during his rebuttal testimony."

We shall consider each assignment of error in the order in which appellant has posited them to us, adding such addi-

tional facts as may be necessary to the discussion. In passing upon the issues raised by the appellants, we bear in mind that we must view them in the light of the circumstances existent at the time the allegedly defamatory remarks were made.[6]

## I.

When reviewing a ruling in a defamation case on a motion for directed verdict or a judgment N.O.V., we are required to make an independent examination of the facts submitted at the trial in order to insure that the constitutional right of free speech has been afforded adequate protection. *Greenbelt Cooperative Publishing Association, Inc. v. Bresler,* 398 U.S. 6, 11, 90 S. Ct. 1537, 1540, 26 L. Ed. 2d 6, 13 (1970); *New York Times, Co. v. Sullivan,* 376 U.S. 254, 285, 84 S. Ct. 710, 728, 11 L. Ed. 2d 686, 709 (1964); *A.S. Abell Co. v. Barnes,* 258 Md. 56, 71, 265 A.2d 207, 216 (1970), *cert. denied,* 403 U.S. 921, 91 S. Ct. 2224, 29 L. Ed. 2d 700 (1971). We "assume the truth of all credible evidence tending to sustain the contentions . . . , as well as all credible inferences of fact reasonably and fairly deducible therefrom." *Kapiloff v. Dunn,* 27 Md. App. 514, 523, n. 9, 343 A.2d 251, 258 (1975), *cert. denied,* 426 U.S. 907, 96 S. Ct. 2228, 48 L. Ed. 2d 832 (1976). We follow that course to be sure that there was sufficient evidence to enable the jury to find, by clear and convincing proof,[7] that the publication was defamatory. Examination of the evidence in the light of the clear and convincing standards leads us to conclude that the issue of whether Walker's statement was defamatory was correctly submitted to the jury, and they properly rendered a verdict for Holly.

---

**6.** As the Court of Appeals, in Garrett v. Dickerson, 19 Md. 418, 447 (1863), recognized, "[i]n cases of slander, words take their actionable character from the sense in which they appear to have been used, and that in which they are most likely to be understood by those who hear them."

**7.** Indubitably the standard of proof applicable to defamation actions is that of "clear and convincing," or in the words of *New York Times, supra,* there was "convincing clarity." *See* Berkey v. Delia, 287 Md. 302, 317, 413 A.2d 170, 178 (1980).

We perceive no need to rehash extensively the law of libel and slander as it presently exists in this State.[8] A brief review, however, of the three requisite elements of a *prima facie* case of defamation is helpful.

Firstly, the alleged defamatory statement or activity, whether oral (slander) or written (libel), must expose a person to "public scorn, hatred, contempt or ridicule" and, thus, be injurious to his reputation. *Thompson v. Upton,* 218 Md. 433, 437, 146 A.2d 880, 883 (1958). *See American Stores Co. v. Byrd,* 229 Md. 5, 13, 181 A.2d 333, 337 (1962). *See also Restatement (Second) of Torts* 559 (1977); Prosser, *Law of Torts* § 111 (4th ed. 1971). A publication is libelous *per se* and presumed to be injurious to one's reputation if, on its face, the "words themselves impute the defamatory character. . . ." *Metromedia, Inc. v. Hillman,* 285 Md. 161, 172, 400 A.2d 1117, 1123 (1979).[9] The defamatory nature of a publication is, of course, not always apparent on its face. In that event, it is termed a defamation *per quod.*[10] *Id.* at 172-173, 400 A.2d at 1123. To support a *per quod* action,

---

**8.** Defamation actions have been part of our legal redress at least since 1356, the year when the first known action was brought. 2 Pollock & Maitland 536 (S.F.C. Milsom 2d ed. 1968). "In the Norman Custumal it is written that the man who has falsely called another a 'thief' or 'manslayer' must pay damages, and, holding his nose with his fingers, must publicly confess himself a liar. Shame was keenly felt. In almost every action before an English local court of the thirteenth century the plaintiff will claim compensation, not only for the damage (*damnum*) but also for the shame (*huntage, hontage, dedecus, pudon, vituperium*) that has been done him. . . ." (Footnotes omitted.) *Id.* at 537.

° For a thorough discussion on the law of defamation in Maryland since New York Times v. Sullivan, *supra, see* Berkey v. Delia, *supra;* Metromedia, Inc. v. Hillman, 285 Md. 161, 400 A.2d 1117 (1979); Jacron Sales Co. v. Sindorf, 276 Md. 580, 350 A.2d 688 (1976); A.S. Abell Co. v. Barnes, *supra;* Stack v. Capital-Gazette Newspapers, Inc., No. 978, C.S.A., Sept. Term, 1980, filed April 13, 1981; Cheek v. J.B.G. Properties, Inc., 28 Md. App. 29, 344 A.2d 180 (1975); Kapiloff v. Dunn, *supra.*

**9.** At common law, a spoken statement that imputed a "heinous crime," an "infectious disease," or "impair[ed] his trade or livelihood" was slanderous. 3 Blackstone, * 124.

**10.** Traditionally, the *per se — per quod* distinction was determinative of whether damages were presumed *(per se)* or whether they had to be specially pleaded and proven *(per quod).* New York Times v. Sullivan, *supra,* abolished presumed damages as unconstitutional, and in so doing, removed that *per se — per quod* distinction. The Maryland Court of Appeals, in *Metromedia, supra,* has retained the distinction only insofar as whether the defamation itself is *per se* or *per quod.*

extrinsic circumstances must be introduced through inducement, colloquium, and innuendo.[11]

Secondly, the alleged defamatory publication must be publicized to a third party, and that party must reasonably understand the publication to be defamatory. *Werber v. Klopfer,* 260 Md. 486, 496, 272 A.2d 631, 635 (1971); *Great Atlantic and Pacific Tea Co., Inc. v. Paul,* 256 Md. 643, 648, 261 A.2d 731, 734-35 (1970).

The third and final requirement of a *prima facie* case of defamation is that damages to the individual's reputation must be proven. The old axiom that libel and slander *per se* equals damages, has, in the manner of the "old soldier," just "fade[d] away." [12] The Supreme Court, in a triology of decisions, administered the *coup de grâce* to the *per se* equals damages apothegm as follows: 1) In *New York Times v. Sullivan, supra, per se* damages, insofar as "public officials" are concerned, have disappeared from the law, 2) *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967) eradicated the *per se* damage concept with respect to public figures,[13] and 3) *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974), eliminated the awarding of *per se* damages where a private individual was defamed. All three cases make clear that even some defamatory speech is protected under the First and Fourteenth Amendment. Therefore, presumed

---

**11.** Inducement, colloquium and innuendo have been defined as follows:

"The inducement . . . alleges those extrinsic facts which are necessary to explain the meaning of the words used. . . ."

"The 'colloquium' . . . is a direct allegation that the language published was concerning plaintiff or concerning plaintiff and his affairs. . . ."

". . . [The] innuendo . . . connect[s] the defamatory matter with other facts and circumstances . . . for the purpose of explaining . . . that which is of doubtful or ambiguous meaning in the language of the publication." 53 C.J.S. *Libel and Slander* § 3 (1948).

**12.** General of the Armies Douglas MacArthur (1880-1964), in his *Address, Joint Meeting of Congress,* April 19, 1954. The words are from a British war song, popular during World War I (1914-1918).

**13.** In this case, as we have previously stated, it is not disputed that appellee is a public figure. For the definition of a public official and public figures, *see* A.S. Abell Co. v. Barnes, *supra* at 63, 265 A.2d at 211.

damages and strict liability are no longer viable in defamation cases.

Where a *public figure* is the injured party, damages will be awarded if the source of the defamation acted with actual malice. The term "actual malice" is held to mean publishing the comment while knowing of its falsity or acting with reckless disregard for the truth. *New York Times, supra; Curtis Publishing Co., supra; A.S. Abell Co., supra.* The rule with respect to private persons is less stringent. A *private person* who is the object of a defamatory publication need only show that the source of the defamation acted negligently in failing to ascertain its defamatory character. *Jacron Sales Co., Inc. v. Sindorf,* 276 Md. 580, 596-97, 350 A.2d 688, 697 (1976).

The law of Maryland is that the trial judge initially has the duty to determine whether a statement is capable of conveying a defamatory meaning. *Metromedia, supra; Cheek v. J.B.G. Properties, Inc.,* 28 Md. App. 29, 344 A.2d 180 (1975). Should the judge find that the publication is amphibolous in that it is capable of both defamatory *and* non-defamatory meanings, the resolution of the question must be put to the jury. *General Motors Corp. v. Piskor,* 277 Md. 165, 352 A.2d 810 (1976); *Werber v. Klopfer, supra.*

Similarly, whether a statement was a harmless joke or a harmful injury to reputation is for the trier of fact to determine. *Werber v. Klopfer, supra. See Arno v. Stewart,* 245 Cal. App. 2d 955, 54 Cal. Rptr. 392 (1966); *Powers v. Durgin-Snow Publishing Co., Inc.,* 154 Me. 108, 144 A.2d 294 (1958); *Myers v. Boston Magazine Co., Inc.,* 403 N.E.2d 376 (Mass. 1980); *Salomone v. MacMillan Publishing Co., Inc.,* 97 Misc. 2d 346, 411 N.Y.S.2d 105 (1978); *Hanson v. Feuling,* 160 Wis. 511, 152 N.W. 287 (1915). *See also* 77 A.L.R.2d 612 (1961). It is of no importance that the joke was *intended* to be humorous because the test is not intention, but how it was reasonably understood by a third person. *Arno v. Stewart, supra; Menefee v. Codman,* 155 Cal. App. 2d 396, 317 P.2d 1032 (1957). The line between "non-actionable humor" and "compensable libel" is not only

vague but dependent upon the audience who hears it and the context in which it was made.

*Werber v. Klopfer, supra,* is the only previous defamation case in this State to have dealt with humor as actionable defamation. Werber, a well-known alumnus of Duke University, published a lampoon,[14] which was a spoof on a legitimate university report concerning student unrest following the assassination of the Rev. Dr. Martin Luther King. The lampoon allegedly identified Klopfer, a very visible and vocal university professor, as one of the "sex deviates, communists, advocates of narcotics" who was on "campus to harangue the student body. . . ." 260 Md. at 487, 272 A.2d at 632. Werber distributed the lampoon to a select few, all of whom were knowledgeable of Duke University affairs. Klopfer sued Werber for libel. At trial, the court found that the lampoon, although intended as humorous, was defamatory in nature. On appeal the Court of Appeals held otherwise and reversed the judgment on the basis that the recipients of the lampoon could not reasonably have interpreted the publication as defamatory inasmuch as they were intimately aware of Duke University affairs and the notoriety of Professor Klopfer. The Court rested its decision on its determination that the *audience that received* the lampoon was a small, controlled group who implicitly understood Werber's humor.

The Supreme Court of New York, in *Salomone v. MacMillan Publishing Co., Inc., supra,* decided that humor had gone "too far" and had transformed itself into actionable defamation. Although *Salomone* involved the defaming of a private individual, it, nevertheless, demonstrates that well-intended humor may not always be readily perceived as such, and when that happens, there may be injury to an innocent individual's reputation. The facts in *Salomone* were that the defendants published a book which was an update of an old, fictitious comic-strip character, "Eloise,"

---

14. "Lampoon" is defined as "a malicious or virulent satire upon a person, in either prose or verse." The American College Dictionary (1964). The lampoon in *Werber* bore the same title as a serious report, "A Crisis in Conscience," but was subtitled "a report that *should have been made.*"

who, as a child, played in the Park Plaza Hotel where she often irritated the hotel manager, Mr. Salomone. In actual fact, the real manager of the Park Plaza was a Mr. Salomone. The defendant's book recreated "Eloise" as a young woman, returning to the hotel to haunt the manager. In the first episode, Mr. Salomone was called a "child molester." Refusing to abide the "child molester" label, Salomone sued for defamation. The defendants asserted that the book was humor. It failed to tickle the Court's "funny bone" because the judges found for Mr. Salomone. The Court observed that, "[h]umor is a protected form of free speech, just as much to be given full scope, under *appropriate circumstances,* as the political speech, the journalistic exposé, or the religious tract." (Emphasis supplied.) 411 N.Y.S.2d at 108. The "humor" of the book eluded Salomone as well as some other persons who did not perceive the publication as a joke. Implying that the communication of all humor involves a risk, the New York Court stated:

> "Parody . . . shuns subtlety. Its aim is to amuse and expose by imitating life, but larger than life. Its essence is distortion and exaggeration. Hence, like the warped and curved mirrors in a carnival fun house, it depends upon the grotesque for its effect." *Id.* at 109.

Sharply contrasting with *Salomone* is *Arno v. Stewart, supra.* There, a professional singer appeared in a television variety show where he was introduced as an "iron-clad singing member of the Mafia." The tone of the program following that introduction was jocular with the defendant thereafter referring to the plaintiff in a favorable and warm manner. Noting that the humorous intent of the defendant was irrelevant if the audience reasonably understood the statement as being defamatory, the court proceeded to find that the comment was non-defamatory inasmuch as the audience could only have reasonably received the statement as a joke.

Walker and WFBR asseverate that a *prima facie* case of defamation was not proven against them because the

584

publication must be reasonably construed by third persons as defamatory, and, appellants aver that proof of that interpretation was lacking. Walker and WFBR further claim that all who heard the publication in regard to Holly on the "Little News of the Morning" could reasonably interpret the publication only as a joke.

Appellants' argument presupposes that all who heard the remark had listened to the entire "Little News" segment of the program and were familiar with the Walker brand of humor. We think it safe to say, in light of Mr. Shriver's testimony, that the Walker show was not highly rated and had about 27,000 listeners, that not all persons who heard the remark had heard the entire segment, and that not all persons tuned to the station were attuned to the Walker wit.

The exact size or composition of the audience which heard Walker's remark about Holly is difficult to determine. Unlike the very small, controlled group who received the lampoon in *Werber v. Klopfer, supra,*[15] the radio audience may vary from second to second by a simple twist of the dial or a push of a button. To demonstrate the unpredictable reactions of a radio audience, Holly adduced testimony that Walker, at one time, had "humorously" told his listeners that Elvis Presley was registered at Johns Hopkins Hospital. The result of that remark was that the hospital was inundated with inquiries about Presley to the point that it had to issue a press release in denial of the Walker comment.

Holly, in the instant case, produced evidence that some people believed Walker's statement relative to Holly's slipping while carrying a TV set during the blizzard. Walker was asked:

"Wasn't really the humor, Mr. Walker that for days there had been newspaper and television coverage of three hundred and fifty or so black people involved in a series of lootings and that Dennis Holly, being black, was linked with this minute

---

15. *Id.*

portion of the black population and, therefore, there was a propensity on his part to loot because he is black. Wasn't that what you mean, that was the alleged humor?"

He responded:

*"It could have been taken that way, also. That would be another way."* (Emphasis supplied.)

Mr. Walter Dixon, a prospective juror who was disqualified because he heard the program involving the remark out of which this litigation arose, was called as a witness on behalf of Holly. Mr. Dixon suggested that the humor of the statement was not clearly discernible. He said he had a Delphic reaction to it. Dixon inferred from the broadcast that, "Dennis Holly hurt his knee escaping the police during the looting, something to that effect."

Judge Greenfeld then asked, "Did you have any particular reaction at that time?" Dixon replied, "First, I laughed. . . . I wondered about it for a second, what was the substance of it. Was it for real or was it a joke, because . . . [appellant] is always joking, and, then, I was wondering about it. . . ."

Several telephone statements by anonymous callers were admitted into evidence for the purpose of demonstrating that some people believed Walker's comment to be true.[16] Calls to the television station were received by Holly on the evening of February 28, 1979. One unidentified telephone caller is quoted by Holly as having said, " 'You pushed George Rogers out of his job and *now you have stolen a television set* and you are getting what you deserve.' " (Emphasis supplied.)

Another unidentified caller asked Holly, " 'Why don't you and *the rest of those looters* swing back in the trees where you came from?' " (Emphasis supplied.)

WMAR-TV's receptionist and switchboard operator,

---

**16.** We have discussed admission of the statements at issue at length in VII, *infra*, and concluded that Judge Greenfeld's ruling was correct. The anonymous phone calls were properly considered in determining the public's reaction to Walker's remark.

Bernadette Hearn, related to the jury that from the evening of February 28, 1979, to March 8, 1979, anonymous phone calls were received from persons inquiring about the truth of Walker's remark. Mrs. Hearn said: "[E]very call was an individual, you know, remark. None were exactly the same. . . . The callers, to the best of my recollection, . . . were asking me, I heard, or either by rumor, or on the radio, the remark that . . . [Holly] had taken a television set during the looting in the street. Was this true?"

There was conflict in the testimony of the witnesses over whether a laugh track was played following Walker's remark about Holly. The absence of simulated laughter, Holly asserted, supported his argument that a listener could reasonably interpret the remark as true. Holly did not personally hear the Walker program, but when his deposition was taken by the appellant, he testified that Susan White Bowden, a fellow employee who initially informed him of Walker's comment, said that laughter followed the remark. At trial, however, Holly told the jury that Mrs. Bowden stated that there was no laughter following the remark. Additionally, Holly testified that Jack Bowden, another employee at WMAR-TV who also heard the Walker broadcast, had said that "[Walker] . . . made his remark and sounded as though he had said something wrong and went straight into a record." Mr. Bowden, however, testified that he did not know whether a laugh track was played, but "he knew . . . [Holly] was laughing." Mrs. Bowden informed the jury that she heard "music and laughter and a cheer and applause and ha, ha, ha, ha and all that sort of stuff." She subsequently qualified her statement by saying, "To be honest with you, Jack [Bowden] and I were laughing and saying 'Oh, God' 'Ha, ha' and trying to keeping the car on the road, so I really don't know what, if anything followed after . . . [the remark]." Mr. Walter Dixon said he did not hear laughter following Walker's comment about Holly.

After viewing the evidence in a manner most favorable to Holly, and assuming the credibility of all witnesses, we think that Judge Greenfeld properly submitted to the jury

the question of whether Walker's remark was received as a defamation or as a joke.

The evidence, tested by the clear and convincing standard, was such as to allow the jury to conclude reasonably that Walker's remark conveyed to the minds of some listeners that Holly, a black man, was associated with the looting that occurred during the blizzard, and that he injured his knee while carrying the pilfered television set while he simultaneously endeavored to elude capture by the police.

Inasmuch as the overwhelming majority of those apprehended for looting were youths and black males, the Walker remark was particularly offensive to Holly who, along with many other black citizens of Baltimore, was sensitive to that type of comment at that particular time. The timing of Walker's remark could hardly have been worse. Under other circumstances, and at a different time, Walker's "humor" might be received differently by all the listeners. That, of course, is a question about which we need not speculate.

## II.

Appellants suggest the Supreme Court's holdings in *Curtis Publishing Co. v. Butts, supra,* and *Gertz v. Robert Welch, Inc., supra,* limit the liability of the media in "public figure" cases to defamation *per se.* In short, they advance the argument that defamation *per quod* is not actionable if the defamed person is a public official or a public figure.

The appellants did not raise this nascent issue in the trial court where even constitutional issues must first be raised and decided. Md. Rule 1085. *Divine Seafood, Inc. v. Attorney General of Maryland,* 37 Md. App. 439, 377 A.2d 1194 (1977), aff'd, 282 Md. 482 (1978); *Braun v. Ford Motor Co.,* 32 Md. App. 545, 363 A.2d 562, *cert. denied,* 278 Md. 716 (1976). As intriguing as appellants' polemic may be, we shall leave exploration and discussion of the question to a time when it is properly before us.

In their reply brief, Walker and WFBR maintain that their argument relative to defamation *per se vis-a-vis* defa-

mation *per quod* was presented to the trial court. They assert that it was embodied in their memorandum of law which supplemented a request for a directed verdict at the conclusion of Holly's evidence.

The memorandum to which appellants refer does not, in our view, address the issue now posed. Rather, the memorandum speaks in terms of punitive damages. Only by a convoluted interpretation can we read the memorandum as being concerned with the issue for which appellants now assert it stands.

## III.

Appellants' argument is bimanous. On the one hand, they aver that punitive damages for defamation *per quod* can never be awarded. On the other hand, they assert that if punitive damages can be awarded, the evidence at trial did not rise to the *New York Times* standard of knowing falsity or reckless disregard.

We must, before reaching the contentions, surmount the barrier that Holly has erected to prevent discussion of appellants' issue. Holly maintains that neither part of the appellants' dichotomous argument is properly before us inasmuch as the matter was not preserved for appellate review. Md. Rule 1085.

From the record, we learn that at the close of all the evidence in the case, the appellants moved for a directed verdict. Md. Rule 552. It was stated in the motion that "*New York Times v. Sullivan, Gertz v. Robert Welch, Inc., Jacron Sales Co. v. Sindorf* and *Marchesi v. Franchino,* [283 Md. 131, 387 A.2d 1129 (1978)] all contemplate and require a more stringent test for punitive damages where the plaintiff is a public figure. [Furthermore,] ... [Holly] has failed ... [to prove] that ... [Walker and WFBR] acted in reckless disregard." We think the motion preserved the issue for our consideration, despite the fact that the subsequent exception to the jury instructions relative to punitive damages, Md.

Rule 554, was made solely by WFBR. The assigned grounds for the exception were alleged First Amendment violations.[17]

Having razed the roadblock, we advance to a consideration of the merits of appellants' arguments. Once again, we are required to make an independent review of the record, assuming the credibility of all witnesses and construing the facts in the light most favorable to Holly.

We think the appellants' assertion that punitive damages cannot be awarded for defamation *per quod* is contrary to the law. The Court of Appeals and this Court have held punitive damages to have a deterrent effect on tortious conduct. *See Wedeman v. City Chevrolet Co.,* 278 Md. 524, 366 A.2d 7 (1976); *Meleski v. Pinero International Restaurant Inc.,* 47 Md. App. 526, 424 A.2d 784 (1981); *Cheek v. J.B.G. Properties, Inc., supra.* The Supreme Court has endorsed the award of punitive damages in defamation cases involving private persons so long as the actual malice standard of knowing falsity or reckless disregard is satisfied. *Gertz v. Robert Welch, Inc., supra.*

Liability for compensatory damages in defamation cases may be predicated upon a standard lower than actual malice, *see Jacron Sales Co., Inc. v. Sindorf, supra.*[18] The defendant's First and Fourteenth Amendment right of free speech must, however, be shielded from abusive and excessive punitive damages via the use of the actual malice standard. *Id.*

The Supreme Court has not thus far addressed the question of whether punitive damages may be awarded in public official-public figure defamation cases, but it has not

---

**17.** We do not decide whether punitive damages violate First Amendment freedom of speech. For discussion on the constitutionality of punitive damages in libel-slander suits involving public figures and public officials, see *"The Constitutionality of Punitive Damages and the Present Role of 'Common Law Malice' in the Modern Law of Libel and Slander,"* 10 Cumberland L. Rev. 487 (1979); *"The Constitutionality of Punitive Damages in Libel Actions,"* 6 Fordham L. Rev. 1382 (1977).

**18.** Maryland has adopted negligence as the standard of liability in private plaintiff defamation suits. Jacron Sales Co., Inc. v. Sindorf, 276 Md. at 596-97, 350 A.2d at 697.

precluded such awards. Nevertheless, other courts, applying the *New York Times* standard of actual malice, have permitted punitive damage awards to public officials and public figures. *See e.g., Appleyard v. Transamerican Press, Inc.,* 539 F.2d 1026 (4th Cir. 1976), *cert. denied,* 429 U.S. 1041, 97 S. Ct. 740, 50 L. Ed. 2d 753 (1977); *Goldwater v. Ginzburg,* 414 F.2d 324 (2d Cir. 1969), *cert. denied,* 396 U.S. 1049, 90 S. Ct. 701, 24 L. Ed. 2d 695 (1970); *Bindrim v. Mitchell,* 92 Cal. App. 3d 61, 155 Cal. Rptr. 29, *cert. denied,* 444 U.S. 984, 100 S. Ct. 490, 62 L. Ed. 2d 412 (1979).

We believe, with respect to punitive damages in defamation cases, that the paramount concern of the Supreme Court of the United States and other courts as well is that the First Amendment is afforded due consideration irrespective of whether the defamation is *per se* or *per quod,* or whether the claimant is a public official, a public figure, or a private citizen.

The appellants urge upon us the proposition that punitive damages may never be recovered in libel *per quod.* They contend that *Curtis Publishing Co. v. Butts, supra,* supports that position. The Supreme Court, in *Butts,* extended the *New York Times* rationale from public officials to public figures, saying:

> "We consider and would hold that a 'public figure' who is not a public official may also recover damages for a defamatory falsehood whose substance makes substantial danger to reputation apparent, *on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers."* (Emphasis supplied.) 388 U.S. at 155, 87 S. Ct. at 1991, 18 L. Ed. 2d at 1111.

The Maryland Court of Appeals, in *A.S. Abell Co. v. Barnes, supra,* recognized that the *Butts* public figure standard was synonymous with the *New York Times* "actual malice" and, therefore, damages could be recovered in a defamation suit involving a public figure only if the

statement were made with knowing falsity or reckless disregard of the truth. In equating the *Butts* standard with the *New York Times* "actual malice," Judge Orth, writing for the Court, declared:

> "It would seem that the distinction between proof establishing *highly unreasonable* conduct constituting an *extreme departure* from the standards of investigation and reporting ordinarily adhered to by responsible publishers and proof establishing reckless disregard for truth or falsity is so fine, if indeed there be a real distinction at all, as not to justify a further clouding of law of defamation by the adoption of the separate standard." (Emphasis in original.) 258 Md. at 63, 265 A.2d at 212.

A valid distinction yet remains in the wake of *New York Times* and the elimination of presumed damages between defamation *per se* and defamation *per quod,* but the distinction is not applicable to the amount of damages awarded.

Judge Smith, for the Court of Appeals of Maryland, made crystalline in *Metromedia, Inc. v. Hillman, supra,* that the lineament between defamation *per se* and defamation *per quod* is severely limited. He wrote for a unanimous Court:

> "[T]he only distinction remaining in Maryland between a libel per se and a libel per quod is that to recover the plaintiff must first show that the publication is defamatory. Where the words themselves impute the defamatory character [libel per se], no innuendo — no allegation or proof of extrinsic facts — is necessary; but otherwise, it is [libel per quod]. This is both a pleading rule and an evidentiary requirement. Where extrinsic facts must be shown in order to establish the defamatory character of the words sued upon, the omission to plead them makes the complaint demurrable for failure to state a cause of action. Failure to prove them would justify a directed verdict." 285 Md. at 172-73, 400 A.2d at 1123.

To follow the course appellants would have us travel, we would have to hold that a statement which is defamatory *per quod* can never be made with knowing falsity and reckless disregard of the truth. We flatly refuse to adopt a rule of law that would permit irresponsible defamation of public figures through the use of implications and innuendo, while simultaneously prohibiting the assessment of punitive damages for that defamation.

When confronted with defamation cases involving jokes or humor, the actual malice standard of *New York Times,* of necessity, must be adjusted to befit the nature of the defamatory remark. The *New York Times* standard, the Supreme Court has stressed, has no strict perimeters:

> " 'Reckless disregard,' it is true, cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication, as is true with so many legal standards for judging concrete cases, whether the standard is provided by the Constitution, statutes, or case law." *St. Amant v. Thompson,* 390 U.S. 727, 730-31, 88 S. Ct. 1323, 1325, 20 L. Ed. 2d 262, 267 (1968). *See Berkey v. Delia,* 287 Md. 302, 413 A.2d 170 (1980).

Walker knew that Holly had injured his knee while playing in a benefit football game and not while carrying a TV set in the snow storm. Nonetheless, Walker made the knowingly false remark in order to be funny. Unfortunately for appellants, what may have been funny or humorous at another time and setting, was not funny or humorous to some listeners under the attendant circumstances.

Judge Greenfeld concluded that the actual malice standard was inappropriate in this case, and, without objection by the appellants, he instructed the jury that in order for Holly to recover, the jury had to find by clear and convincing evidence that:

1. Walker's remark "was reasonably, even if mistakenly understood by a reasonable listener, to mean that . . . [Holly]

had committed a crime involving the unlawful taking or stealing of a television set."

2. ". . . Walker made the remark, either knowing that the remark would be reasonably interpreted by reasonable listeners charging . . . [Holly] with this crime or he made the remark with a reckless disregard that the remark would be so interpreted by a reasonable listener."

3. ". . . Walker intended the remark to be received by a reasonable listener as a true and serious statement of fact that . . . [Holly] committed the crime or that . . . Walker made the remark with a reckless disregard as to whether the remark would reasonably be received as a true and serious statement of such fact."

4. ". . . [T]he remark was reasonably understood by a reasonable listener as a true and serious statement of fact that . . . [Holly] committed a crime.

Judge Greenfeld also instructed the jury that "reckless disregard means a high degree of awareness." [19]

Our constitutionally mandated independent review of the record leads us to affirm the finding by the jury that Walker acted with reckless disregard of the fact that his statement concerning Holly could be received by a reasonable listener as true.

Walker was the best judge of the effect his humor had on his listeners. As we have already observed, "hundreds" of listeners believed his statement that Elvis Presley was registered at Johns Hopkins Hospital. The hospital was swamped with telephone calls that sought to verify what Walker had said. Walker was aware, or should have been, that the looting at the time of the blizzard involved a high percentage of black males, and that the appellee is a black man. Furthermore, Walker was cognizant of the fact, or should have been so cognizant, that the looting was a highly sensitive subject among Baltimore's black residents. Walker stated at the trial that "[t]he looting wasn't funny. The

---

**19.** It has been said that "[r]ecklessness is, after all, only negligence raised to a higher power." Goldwater v. Ginzburg, *supra* at 343.

looting was a tragedy, but the way that I treated the looting on the air is what is funny." Obviously, neither Holly nor the jury shared Walker's sense of humor. Moreover, Walker, in his testimony, acknowledged that his remark about Holly could be believed as true.

We think the evidence perspicuously supports the jury's finding that Walker acted with a high awareness that the "joke" relative to Holly could be received as true, and as such, punitive damages are properly awardable.

## IV.

Once again Holly has created a barricade that must be demolished before the issue raised by WFBR may be considered on its merits. Holly asserts that WFBR has failed to preserve for appellate review the issue of whether it is liable for punitive damages. Specifically, Holly says that WFBR did not comply with Md. Rule 554 d and e. No exception was taken to the trial judge's jury instruction on punitive damages with respect to the corporate defendant. WFBR did, however, raise the issue in its motion for a directed verdict at the close of the appellee's case. The trial court reserved ruling on the motion until the close of all evidence at which time the motion was renewed and denied. We think the record manifests that the issue has been properly preserved for our review, and that Holly's objection to our considering it is without merit.

**Having destroyed the roadblock, we now turn our attention to WFBR's grievance.** Little need be said other than that we reject the view advanced in the *Restatement (Second) of Torts* [20] that limits the situations in which

---

**20.** The *Restatement (Second) of Torts* § 909 (1979) provides:

"Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,

(a) the principal or a managerial agent authorized the doing and the manner of the act, or

(b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or

punitive damages may be awarded against an employer or principal, where the employee or agent has made a defamatory remark. The appellate courts of this State have expressly declined to adopt the *Restatement* position but have, instead, followed the rule of derivative liability for punitive damages in employer-employee, principal-agent relationships. *See Safeway Stores, Inc. v. Barrack,* 210 Md. 168, 122 A.2d 457 (1956); *Meleski v. Pinero International Restaurant, Inc., supra.* We hold that Judge Greenfeld did not err in overruling the motion or in refusing the requested instruction.

## V.

Since *Davidson v. Miller,* 276 Md. 54, 344 A.2d 422 (1975) struck from Article IV, § 8 of the Maryland Constitution the absolute right of removal in civil cases, the determination of whether to remove a civil suit is vested in the sound discretion of the trial judge. *Id.* at 83, 344 A.2d at 439. We have applied *Davidson* strictly. *Beach v. Mueller,* 32 Md. App. 219, 359 A.2d 232 (1976); *Firstman v. Atlantic Construction & Supply Co.,* 28 Md. App. 285, 345 A.2d 118 (1975). Of course, the exercise of the trial judge's discretion is subject to appellate review as to whether that discretion was abused.

The appellants' suggestion of removal from Baltimore City to elsewhere was predicated on the fact that the jury would be composed of persons who had black skin, that the plaintiff was black, that the case definitely had racial overtones, and that his claim was an attempt "to label an innocuous remark, intended as humor, as a racial slur." Judge Robert L. Karwacki, in denying the removal, said in pertinent part:

(c) the agent was employed in a managerial capacity and was acting in the scope of employment, or

(d) the principal or a managerial agent of the principal ratified or approved the act."

"I ... think that to grant removal in this case would be a dangerous precedent and frankly would be an insult to a large proportion of our citizenry, because ... I would be saying to the citizens of this City that we have here an issue, ... which we are incapable of dealing with ... because of the fact that black citizens might sit on this Jury and black citizens are incapable of making a rational and logical decision in this case, they're incapable of answering under oath honestly the question of whether racial prejudice prevents them from deciding this case fairly. To presume such dishonesty on [the part of] a large proportion of our community would be ... a terrible thing to do. It is for these reasons that the removal will be denied."

We think that Judge Karwacki did not abuse his discretion, but that he properly exercised it in denying the removal.

## VI.

As we have seen, Walker's broadcast concerning Holly was made at a time when feelings were hyper-sensitive to the looting that took place during the "Blizzard of 79." Because of the circumstances of the looting and the reported racial imbalance of looters, it is difficult to discern between references to *race* and *racial slurs*. Judge Greenfeld was of the view that Holly's race, as well as all references to the race of the overwhelming majority of the known looters, was relevant to the issue of whether Walker's remark was defamatory. The judge said: "The public's association of looting with blacks could be germane to the manner in which the remark was reasonably perceived by the public."

Judge Greenfeld, cognizant of the "delicate nature of the subject" of race, issued a caveat to counsel "that references to race [were to] be strictly kept within the confines of relevancy...." Additionally, he said that he "[would] not permit [an] unbridled appeal" to racial prejudice "during the course of the trial...."

From a reading of the lengthy record, we are unable to state that Judge Greenfeld did not do exactly what he said he would do. We do not find within the record that Holly's counsel used any "racially inflammatory words" that would justify a reversal and a new trial.

Viewed in the light of the cold record, an argument *might* be made that certain comments may have appealed to racial prejudice, but it must be remembered that Judge Greenfeld, a capable and experienced trial judge, presided over the trial. From his vantage point, he had every opportunity to observe the proceeding and to determine under the attendant circumstances the impact of those comments. Obviously, he believed them to be within the ground rules he laid down at the outset. We most certainly cannot say he was wrong in his evaluation of the remarks and in permitting them to stand.

## VII.

The appellant next challenges the admission into evidence of various anonymous telephone calls received by Holly and by Bernadette Hearn, a receptionist and switchboard operator at WMAR-TV. Mr. Holly testified that he received several anonymous telephone calls on the evening of February 28, the date of the Walker broadcast. The calls were related to the remark aired by Walker that morning. Holly was asked by his counsel, Mr. Ellin:

> "With regard to . . . [Walker's] remark, would you tell His Honor and the Members of the Jury what happened if anything, with regard to receiving any messages or telephone calls from any third persons regarding this remark.
>
> [Mr. Holly]: That would have been — that would have been later in the evening, after the first news show, about 6:30.
>
> . . . .
>
> [He responded], I was seated at my desk and the first phone call I got was from a woman who did not

identify herself and she started out by asking me was I Dennis Holly and I said 'yes' and she said —

MR. HEARNE [Co-counsel for appellant]: Objection.

THE COURT: Overrule the objection.

[Mr. Ellin]: Go ahead.

[Mr. Holly]: She said, 'You pushed George Rogers out of his job and now you have stolen a television set and you are getting what you deserve.' So, I started to protest —

[Mr. Ellin]: Slow up, about the television set, take your time. Repeat what you said from the time, now, about the television set, what was said to you?

[Mr. Holly]: 'And now you have stolen a television set and you are getting what you deserve.'

[Mr. Ellin]: Getting what you deserve.

[Mr. Holly]: At that point I tried to explain to her that I hadn't stolen anything and she said 'You are not better than the rest of them.' She said, 'All you niggers are thieves' at which point I ended the conversation. I hung up on her.

[Mr. Ellin]: Did you receive any other telephone calls, Mr. Holly?

[Mr. Holly]: Yes, I did.

[Mr. Ellin]: Would you tell us about those, please.

[Mr. Holly]: I had a call from a man that same evening, it would have been later in the evening, and, again, this was a very brief conversation. He confirmed that it was me, Dennis Holly, and he said —

MR. HEARNE: Objection.

THE COURT: Overruled. You can answer.

[Mr. Holly]: He said, 'Why don't you and the rest of those looters swing back up in the trees where you came from' and hung up."

We have previously stated herein that anonymous telephone calls were also received by Mrs. Hearn during the period February 28, 1979 through March 8, 1979. She testified that approximately ten calls were from unidentified persons who inquired as to whether the Walker remark concerning Holly was true.

Mrs. Hearn was asked: "Would you tell his Honor and the Members of the Jury about some of these calls you received?"

After Judge Greenfeld overruled an objection to the above question, she answered: "The content of most of the calls were people questioning me about the remark made, was it true or not."

Following further questioning, objections, and rulings, Mrs. Hearn told the jury:

> "Well, every call was an individual, you know, remark. None were exactly the same, so I was trying to give you the gist, by the various calls. The callers, to the best of my recollection, they were asking me, I heard, or either by rumor, or on the radio, the remark that Dennis Holly had taken a television set during the looting in the street. Was this true?"

The testimony was permitted under the state-of-mind exception to the hearsay rule, after a finding by the trial judge that statements were "relevant to determining the public's acceptance or reaction to ... [Walker's] comment...."

In this Court, the appellants attack that testimony on the ground that the content of the telephone calls was clearly hearsay. Appellants further aver that even if the telephone calls were admissible under the state-of-mind exception, they were not made with "apparent sincerity."

It is well established that in libel and slander cases statements made by third persons in reaction to the alleged defamatory comment are admissible under the state-of-mind exception to the hearsay rule. *Mutual Life Insurance Co. of New York v. Hillmon,* 145 U.S. 285, 12 S. Ct. 909, 36 L. Ed.

706 (1892); *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.,* 533 F.2d 510 (10th Cir. 1976); *Mattox v. News Syndicate Co., Inc.,* 176 F.2d 897 (2d Cir.), *cert. denied,* 338 U.S. 858, 70 S. Ct. 100, 94 L. Ed. 525 (1949); *Elmer v. Fessenden,* 151 Mass. 359, 24 N.E. 208 (1889); *Ardash v. Karp,* 18 Mich. App. 241, 170 N.W.2d 854 (1969); *Herrmann v. Newark Morning Ledger Co.,* 48 N.J. Super. 420, 138 A.2d 61 (1958); *Hall v. American Friends Service Committee, Inc.,* 74 Wash. 2d 467, 445 P.2d 616 (1968); 6 *Wigmore on Evidence* § 1731 (Chadbourn rev. 1976); 12 A.L.R.2d 1005 (1950). The evidence, while hearsay, is poignantly relevant in order to demonstrate "the extent and effect of the publication and to sustain . . . [Holly's] claim of general damage to . . . [his] reputation and profession." *See Ardash v. Karp, supra.* The evidence in this matter establishes that there were people who believed Walker's remark to be true. Identity or authenticity of the phone caller or phone calls is not necessary under the state-of-mind exception. *Dennett v. State,* 19 Md. App. 376, 311 A.2d 437 (1973). The only requirement is that the statement was made with "apparent sincerity." *Lapelosa, Inc. v. Cruze,* 44 Md. App. 202, 407 A.2d 786 (1979), *cert. denied,* 287 Md. 754 (1980); *McCormick on Evidence* § 294 (2d Ed. 1972).

The determination of whether a statement is trustworthy of belief and, hence, admissible under the state-of-mind exception to the hearsay rule must be made on a case-by-case basis. To assist in making that determination, Professor Wigmore has articulated three "classes of reasons underlying the exception," namely:

> "a. *Where the circumstances are such that a sincere and accurate statement would naturally be uttered, and no plan of falsification be formed;*
>
> b. Where, even though a desire to falsify might present itself, other considerations such as the danger of easy detection or the fear of punishment would probably counteract its force;
>
> c. Where the statement was made under such conditions of publicity that an error, if it had

occurred, would probably have been detected and corrected." (Emphasis added.) 5 Wigmore, *Evidence* § 1422 (Chadbourn rev. 1974).

The anonymous telephone calls received by Holly and Mrs. Hearn were within the ambit of the first reason for the exception. Judge Greenfeld prudently limited Mrs. Hearn's testimony to the specific time period from February 28, 1979, the date of the broadcast, to March 8, 1979, the day before the defamation suit was filed. Obviously, any phone calls received *after* the commencement of the suit could have been prompted by the litigation rather than made with "apparent sincerity" in reaction to the "joke." Patently, any "plan for falsification" could be more readily formulated and put into operation following the filing of the action at law.

Although the telephone calls in the instant case were made on the evening of February 28, 1979, a point in time several hours after Walker's remark, the calls were, nonetheless, in spontaneous response to the comment. We perceive, in this case, no error in the admission or the substance of the telephone calls.

## VIII.

Upon conclusion of the appellants' case, Holly was called by his attorney as a rebuttal witness. Specifically, he denied having stated to Mrs. Bowden that he was going to "make money" from Walker's remark. Thereafter, Judge Greenfeld instructed the jury as to the law of the case. He advised them, additionally, that closing arguments would occur the next morning. The court then recessed for the day. An unusual situation developed during the evening hours.

Judge Greenfeld arrived home at about 10 p.m., where he discovered appellants' attorneys. They presented the judge with a tape recording of a person they said was a prospective witness who would rebut Mr. Holly's testimony denying that he made the remark about "making money" from Walker's

comment. The judge called Holly's lawyer and apprised him of what was happening at the judge's residence.[21]

A hearing was held the next morning in the judge's chambers. At the conclusion of the matter, Judge Greenfeld refused to admit what appellants term, "newly discovered evidence."

It is axiomatic that the decision to permit a party to reopen his case for the purpose of taking additional testimony is within the sound discretion of the trial judge and will not be disturbed on appeal unless there has been an abuse of that discretion. *Telak v. Maszczenski,* 248 Md. 476, 237 A.2d 434 (1968); *Nicholas v. Owrutsky,* 230 Md. 60, 185 A.2d 498 (1962).

Judge Greenfeld found that the person whose testimony appellants sought to put before the jury had known of Mrs. Bowden's testimony at least two days before the close of the evidence and had sufficient time to notify the appellants of what he knew. Additionally, the appellants had adequate time to have uncovered the witness' existence prior to trial. Moreover, since the jury instructions had already been given, reopening the case at that juncture for the purpose of hearing testimony from one person would "make ... [the witness] unfairly prominent in the jury's mind," and would "unduly delay the trial."

We think Judge Greenfeld's refusal to reopen the case was a valid exercise of his "discretion carefully and fairly" made. *Telak v. Maszczenski, supra* at 495, 237 A.2d at 444. The appellants' argument that the judge abused his discretion is utterly without merit.

## IX.

We have considered and rejected each of the arguments advanced by the appellants, and ordinarily that would

---

**21.** *See,* however, Md. Rule 1230, Appendix F, Canon 7, EC 7-35 and DR 7-110. *See also* Md. Rule 1231, Canon XVI.

conclude our discussion of the case. We feel obligated, however, to right a wrong that stems from *dicta* in *Cheek v. J.B.G. Properties, Inc., supra.*

Recently, this Court decided *Meleski v. Pinero International Restaurant, Inc., supra.* In that case, we pointed out that *Cheek* explicated on what we thought the law with respect to awarding punitive damages *ought* to be and what it was in a majority of other states.

Judge Melvin, speaking for the Court, said, in *Meleski:*

> "In espousing the dicta for guidance of the trial judge to whom *Cheek* was remanded, we were influenced by the logic of allowing apportionment of punitive damages and the inequity inherent in a rule to the contrary." 47 Md. App. at 548, 424 A.2d at 796.

We made clear in *Meleski* that what ought to be the law, as we opined in *Cheek,* and what it is are two decidedly different things. While we may still harbor strong beliefs that apportionment of punitive damages is the proper and just approach, it is not the law of this State.

*Meleski* flatly holds that:

> "[L]iability for punitive damages, where there are multiple defendants who are in a principal-agent relationship, is joint and several without regard to their relative culpability. As this rule presently stands it does not permit the application of and cannot co-exist with a so-called 'apportionment' rule that allows a separate award against each of several defendants measured by each defendant's individual culpability." *Id.* at 548, 424 A.2d at 796. *See Nance v. Gall,* 187 Md. 656, 50 A.2d 120 (1946).

Because the consideration of the punitive damages, in the case now before us, was submitted to the jury on the basis of *Cheek's dicta,* so that separate verdicts were rendered as to Walker and WFBR, we are compelled to reverse that portion

of the judgment of the Baltimore City Court and remand for a new trial on the issue of punitive damages only.

In fairness to Judge Greenfeld, we make patent that *Meleski* was not decided at the time this case was tried. The same is, of course, true to counsel for both sides, all of whom were apparently misdirected by *Cheek's dicta.*

> *Judgment affirmed in part and reversed in part.*
>
> *Case remanded for further proceedings on the issue of punitive damages.*
>
> *Costs to be paid by appellants.*